## McDANIEL v. PARISH.

FRAUD ; FRAUDULENT TRANSFERS ; FATHER AND CHILD.

1. Fraud is not to be presumed, nor can it be established except upon clear proof, either circumstantial or direct.
2. If the form and design of a transaction assailed for fraud may be traced to an honest and legitimate source equally as to a corrupt and fraudulent one, the former should in all cases be preferred.
3. Suspicious circumstances are not the equivalents of proof; and unless all the facts and circumstances of a given case, when taken together, are strong enough to generate a clear, rational conviction of the existence of the fraud charged, that conclusion ought not to be adopted which will destroy a *prima facie* good title to property, and blacken the characters of the parties concerned.
4. Where in a suit in equity by creditors to subject to their claims certain real estate which is in the name of a third person, but which is alleged to be the property of their debtor, a prior unrecorded deed of the property to the debtor's daughter is recorded after the commencement of the suit, and the testimony taken shows that about seventeen years before the filing of the bill, and when she was but 18 years old, the daughter had contracted with her father to manage his household and care for her invalid mother, for $50 a month and her support and maintenance, and that the property in question was paid for, in partial satisfaction of the debt due the daughter, out of lump sums of money received by the father 11 and 14 years after the date of such contract, the circumstances while suspicious are not sufficient to cause the deed to the daughter to be invalidated for fraud.
5. A father, after emancipating his minor child, may himself contract to employ and pay the child for his services, and be bound in consequence like any stranger to fulfill his agreement.
6. While in an equity suit the failure of a person to testify, whose testimony would naturally be of importance to one of the parties, may furnish ground for suspicion and adverse comment, such failure cannot be allowed the effect of impeaching and discrediting the testimony of other witnesses.

No. 257. Submitted June 7, 1894. Decided October 2, 1894.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, hold-

ing an equity term, dismissing a judgment creditor's bill. *Affirmed.*

The COURT in its opinion stated the case as follows:

The appellants, John H. McDaniel and Leigh Chalmer's, in this case are judgment creditors of Joseph W. Parish, one of the appellees, and as such judgment creditors they filed a bill against the judgment debtor and a certain Jonas H. McGowan, charging that a certain dwelling house and premises in the city of Washington had been purchased with money belonging to Parish, the debtor, and had been conveyed to McGowan, who held the same in secret trust, for the use and benefit of Parish, the debtor, and for the purpose of hindering, delaying and defrauding his creditors.

The bill called upon the defendants to answer the allegations fully and particularly, but expressly waived oaths to such answers. Parish and McGowan, however, both answered the bill under oath ; and they both expressly denied all fraud and collusion charged in the bill, and denied that the property had been purchased for Parish, or with his money. But they averred that the property had been purchased for the daughter of Parish, the debtor, and with her own personal means, earned by her labor, and that the property had been conveyed to her by deed duly executed by McGowan and wife.

Upon the disclosures made in these answers, the plaintiffs obtained leave and filed an amended bill, in which the daughter, Emily E. Parish, was made a codefendant with the two defendants named in the original bill. In this amended bill it is charged that the whole transaction, of the purchase and conveyance of the property, was a fraudulent scheme, devised and concocted by the defendants, to cheat and defraud the creditors of Parish, and that the name of the daughter was used as a shield and a blind to deceive and keep off the creditors of Parish, the real owner of the property : That the daughter had no estate or means of her

own; and that the money paid on the purchase of the property was in truth the money of the debtor, received by him under certain acts of appropriation, passed by the Congress of the United States. It is also charged that the deed made by McGowan and wife to Emily E. Parish was never in fact delivered to the latter, and was never placed upon record, until after the institution of this suit.

By this amended bill, a full and particular answer, both to the original and amended bill, was required of the new defendant, Emily E. Parish, and also of McGowan to the amended bill, but no answer was required of the defendant Joseph W. Parish. The oath to the answers required by the amended bill was not waived, as were oaths to the answers to the original bill.

The defendant McGowan answered the amended bill, denying all fraud and collusion charged, and averred the right of property to be in the daughter of J. W. Parish, as in his former answer. He also answered the special matters charged in the amended bill, and explained the circumstances under which the property was purchased for and subsequently conveyed to the said Emily E. Parish.

The defendant Emily E. Parish answered under oath, and denied all fraud and collusion charged in both the original and amended bills, and set up and claimed right to the property in herself; and averred that it had been purchased with her own money, received from her father on account of services rendered by her, under a contract made with him for such services.

Replications were entered to the answers, and proof was taken, the principal witnesses being Emily E. Parish and J. H. McGowan, two of the defendants; the former of which being called and examined at great length by the plaintiffs, and the latter by and on behalf of the defendants.

The case was brought on to hearing before the chief justice of the Supreme Court of the District, and that learned justice, after argument and due consideration,

passed an order dismissing the bill with cost. The plaintiffs have appealed.

*Mr. J. J. Johnson* and *Mr. D. W. Baker* for the appellant.

*Mr. George C. Hazelton* for the appellees.

Mr. Chief Justice Alvey delivered the opinion of the Court:

The gravamen of the case is the alleged fraud and collusion of the defendants, in respect to the purchase and conveyance of the property in question. To overcome the effect of the deeds—the one from Gist to McGowan and the other from McGowan to Emily E. Parish—the *onus* of proof is, of course, upon the plaintiffs. Fraud is not to be presumed, nor can it be established except upon clear proof. It may, however, be established as well by circumstantial as by direct evidence. But if the form and design of the transaction assailed may be traced to an honest and legitimate source equally as to a corrupt and fraudulent one, the former should in all cases be preferred. Suspicious circumstances are not the equivalents of proof; and unless all the facts and circumstances of the case, when taken together, are strong enough to generate a clear rational conviction of the existence of the fraud charged, that conclusion ought not to be adopted which will destroy a *prima facie* good title to property, and blacken the characters of the parties concerned.

In this case, in the absence, as may be supposed, of other available proof, the plaintiffs ventured the experiment of calling the principal defendant, Emily E. Parish, as their witness. She was subjected to a most protracted and scrutinizing examination, running into great detail and much irrelevant matter. And while there are some apparent confusion and want of consistency, and, possibly, of full understanding, in some parts of her testimony, yet, when taken as a whole, and fairly construed, there is nothing in it, in my opinion, that justifies the conclusion that she was relating

an entirely fabricated story, as she must have been, if the allegations of the plaintiffs are founded in fact.

According to the testimony of this witness, she earned the money with which the property was purchased, at the price of $6,500, under a contract with her father, made in 1875, when she was then but eighteen years of age. She was the only daughter, and her mother was an invalid, requiring attention herself, and was wholly unable to attend to the household affairs of the family. The daughter, as she testifies, had formed the plan of applying for an office in one of the Departments of the Government, and so informed her father, and requested his assistance. She was anxious to make an independent income for herself. This her father opposed, feeling that he could not dispense with her services in the management of his household, and in the care of his invalid wife. He proposed to her, she says, that if she would give up her plan of seeking an office, and remain in charge of his house, and take care of her mother, he would give or pay her $50 per month, and supply her with board and clothes, and this proposition was accepted by her; and that she remained continuously in the performance of that service until after she had attained the age of 35 years. There is no question in the case but that she did perform the services faithfully. This is shown by other testimony than her own. She swears, that on this claim for wages, running since 1875, her father paid her in 1886, out of money received under an appropriation by Congress, the sum of $5,000, which she placed in one of the banks of this city in her own name, where it remained for more than a year, and until she drew it out to pay to McGowan the sum of $4,500 on the property purchased for her; and that the further sum of $2,000 was paid by her father, out of another appropriation for his benefit, in 1889, to McGowan for her, and upon which last payment she obtained the deed from McGowan and wife.

The important, indeed, the controlling question in this

case is, whether the statement of this witness, examined by the plaintiffs, with respect to the contract for services, and the payment of the money thereon *bona fide*, be credible or not? There is nothing to impeach the statement apart from the peculiar nature of the transaction itself; that is to say, there is no conflicting testimony upon the subject. McGowan in his testimony corroborates the statement of Miss Parish, as to the contract for service and the money due thereon, to the extent of saying that he had derived such knowledge from both the father and the daughter, and that the money paid to him for the property was money belonging to Miss Parish, earned by her under contract with her father. If such contract was in fact made, and the money was paid thereon as stated, all the other portions of the transaction relating to the purchase and conveyance of the property are fully and clearly stated by McGowan in his testimony, and there is nothing incredible in it. He explains fully how and why it was that he purchased the property in his own name in the first instance, and took the conveyance to himself. In this there was nothing very remarkable, considering his friendly relation to the family, and particularly to the father. It was not unnatural that he should desire to aid and assist the daughter in her effort to purchase a home for herself and her parents, provided he could do so without incurring liability himself. And in the method adopted to accomplish this, there was nothing tending to impeach the transaction, except the failure to record the deed to the daughter, and this omission would seem to be reasonably explained. The whole case, therefore, turns upon the question, whether the money applied in the purchase of the property was that of the daughter, coming to her in the manner stated in the testimony, or that of the father invested under the fraudulent disguise of the name of the daughter, in order to deceive his creditors. It must be confessed the case is not free from difficulty and doubt, but in applying the cautious

principles of the law, which presume in favor of honesty and against fraud, I am not able to conclude that the title set up in the daughter has no other foundation than a mere fraudulent and deceptive color, imparted to it by the form of a conveyance. See case of *Gottlieb* v. *Thatcher*, 151 U. S. 271, 278, 279.

It has been urged on behalf of the plaintiffs, as one of the grounds for imputing fraud, that at the time of the alleged contract made by the father for compensation to the daughter for services to be rendered, the latter was a minor, only eighteen years of age, and that the father was therefore legally entitled to her services, to say nothing of the filial duty of the child to serve her parents. But while this general principle is unquestionable, there is another principle equally well settled, and that is, that a parent may voluntarily relinquish the right to his child's earnings, and may permit the child to earn for itself, receive and appropriate its earnings at pleasure. He is under no legal obligation, though he be insolvent, to claim such earnings for the benefit of his creditors. *Wilson* v. *McMillan*, 62 Ga. 16 ; *Atwood* v. *Holcomb*, 39 Conn. 270 ; *Wambold* v. *Vick*, 50 Wis. 456. A father may emancipate his child, son or daughter, for the whole remaining period of minority, or for a shorter term, and this may be effected by instrument in writing, verbal agreement, or by implication from his conduct; and such emancipation is valid against the creditors of the parent. It is laid down as text law, by a recent writer of high repute, that " the minor who is released from his father's service stands, as to his contracts for labor with strangers or with him, upon the same footing as if he had arrived at full age ; and such being the case, the father may himself contract to employ and pay the child for his services, and be bound in consequence like any stranger to fulfill his agreement." Schouler, Dom. Rel., Sec. 268, citing cases of *Steel* v. *Steel*, 12 Penn. St. 64 ; *Hall* v. *Hall*, 44 N. H. 293; *Wright* v. *Dean*, 79 Ind. 407.

It is also insisted, that even assuming that such contract was made, the compensation to be paid was excessive in amount and is evidence of fraud.   Whether excessive or not, in view of the nature and extent of the services to be performed, is not the question that we have to determine in this case.   The question here is, assuming the contract to have been made as testified to, whether the amount is so grossly excessive as to be evidence of fraud and combination to cheat the creditors of the father.   Six hundred dollars per annum, besides board and clothes, may be regarded as high wages to be paid to a daughter for the care of an invalid mother, and the management of the household of the father, but I am entirely unable to say that it was so extravagant as to be evidence of fraud.   If the contract was made in good faith, the parties were competent to make it, and it was binding upon them.

It has been strongly urged, as an evidence of fraud, that the father, Joseph W. Parish, has been in the possession of the property ever since it was purchased by McGowan, and that he has directed improvements thereon as if he were owner.   This would, doubtless, be a fact of great weight, in the absence of explanation.   But it has been explained, and there is nothing unreasonable in the fact that the parents should live in the house with the daughter, and the father direct repairs thereof, when without other home.

The fact that the deed from McGowan to Miss Parish was not placed upon record is regarded as evidence of fraud. All secret transactions naturally give rise to suspicion.   But in this case, the grantee swears that she was not aware of the necessity or importance of having the deed recorded, and that no one advised her upon the subject; that she bundled up the deed and the contract and sent them to the office of McGowan to be placed in the safe, for safe preservation, where they remained until called for to be used in this suit. It is not pretended that the plaintiffs have been defrauded or prejudiced by the failure or delay in having the deed

recorded; and a party cannot be charged with fraudulently secreting a deed by failing to place it upon record at the earliest moment. *Shirras and others* v. *Craig and Mitchell,* 7 Cranch, 34. The circumstance of unduly withholding a deed from record is undoubtedly indicative of a fraudulent design, but, like other facts, it may be explained, and all adverse inferences repelled.

Another circumstance has been strongly emphasized as furnishing ground for the presumption of fraud, and that is the failure of Joseph W. Parish to become a witness for his daughter. That such fact, under the circumstances of this case, furnishes ground for suspicion and adverse comment, is unquestionably true. What motive may have influenced the father thus to stand aloof and decline to add his testimony in support of his daughter's claim, it is difficult to conjecture. He had placed on file his answer to the original bill, under oath, wherein he denied all fraud and collusion charged, but that, under the rule of court, was not evidence for the defendants. Whether it was that he shrank from a probing into and a disclosure of his private affairs, or whether he was apprehensive that he would not be able to stand the ordeal of a rigid and searching cross-examination, are questions that are difficult to answer. We have, however, the testimony of the daughter and that of McGowan that cannot, without the risk of doing injustice, be discarded; and that being so, it would seem to be both inconsistent and unjust to impeach and annul the title of the daughter upon a presumption founded upon the unexplained conduct of the father. His failure to testify cannot be allowed the effect of impeaching and discrediting the testimony of other witnesses.

Upon careful examination of all the facts of the case, and after the best consideration that I have been able to give to the evidence produced, I am brought to the conclusion that the plaintiffs have failed in their proof to sustain, with reasonable certainty, the allegations upon which their right to

relief is founded; that the charges of fraud and collusion, as against the daughter, are not sufficiently established to justify the court in declaring the deed to her void; and therefore the decree of the court below should be affirmed. *Gumaer* v. *Colorado Oil Co.*, 152 U. S. 88, 93, 95. And such being the opinion of the majority of this court, it follows that the decree must be affirmed, with costs to the appellees.

*Decree affirmed.*

Mr. Justice MORRIS, concurring:

I concur in the conclusion announced by the Chief Justice in his opinion in the above entitled cause, on the ground that the assumed fraudulent character of the contract in the case between Joseph W. Parish and his daughter, Emily E. Parish, is not sustained by the testimony. That contract is unusual and extraordinary. There is just cause to suspect that no such contract was ever made; and there is just cause to suspect that, if it was actually made, it was designed for the purpose of evading the claims of the creditors of Joseph W. Parish. But suspicion is not proof; and the testimony fails to disprove the existence of the contract, or to show its fraudulent character. On the contrary, the contract is proved by the witness called by the complainants themselves, a hostile witness, it is true, but fully accredited by them; and they fail to show that, while the contract was unusual and extraordinary, it was unreasonable or improper. On the validity of this contract the case of the defendants depends. On its overthrow depends the case of the complainants. On these it was incumbent to produce testimony to discredit it, if they could. This they have not done. Having themselves proved the contract by their own witness, whom by calling they have asserted to be a credible and trustworthy witness, and having adduced no other testimony on the subject, they seem to have overthrown their own case. It is not apparent to us that the contract, while an exceedingly suspicious one, should of itself be regarded as fraudulent.

For this reason I concur in sustaining the decree of the court below dismissing the bill of complaint.

Mr. Justice SHEPARD, dissenting:

I regret my inability to concur in the disposition made of this appeal. I cannot escape the conclusion that the decree should be reversed instead of affirmed, and deem it proper to give some of the reasons which have influenced my judgment.

Joseph W. Parish had no visible property subject to execution for debt. His only means seem to have consisted of claims against the Government, dependent upon favorable action by Congress. He was certainly in debt and insolvent early in 1876, and I think it fairly presumable that he was so at an earlier period. He had an invalid wife, two sons whose ages are not given, and a daughter, the defendant Emily E. Parish, who was born in September, 1857. What business the said Parish was engaged in, or by what means he maintained his family from 1875 to 1886 nowhere appears in the record. In May, 1886, under an appropriation made by Congress, he received from the Treasury something over $56,000; in May, 1889, he received about $18,500. It is evident that large amounts of these payments went to associates and attorneys. How much Parish retained is unknown, as two of his attorneys, on objection made by defendant, declined to answer concerning the transactions and he himself did not appear as a witness. Prior to May, 1886, several judgments had been recovered against him in the courts of the District, upon which executions had been returned unsatisfied. Some of these judgment creditors, suspecting that the house and lot in controversy had been purchased with the money of Parish and for his benefit, filed the original bill in this cause on May 12, 1892, to subject it to their demands. The lot with the house upon it was conveyed by Gist and wife to Jonas H. McGowan, October 25, 1887, and stood in his name

upon the records until after the bill was filed. In June, 1886, Parish delivered to his daughter $5,000 of the collection made from the Government, of which she gave $4,500 to McGowan to make the cash payment on the purchase of the property. The remainder of the consideration, $2,000 with interest, was paid in 1889, out of the $18,500 collection referred to above. McGowan conveyed the property to Emily E. Parish in 1889, but the deed had not been recorded at the time the bill was filed. These facts made a *prima facie* case of fraud as to creditors, which said Emily E. Parish, in my opinion, was called upon to overcome. A voluntary gift or advancement to her under such circumstances would not be sufficient; consequently it became her duty to show that the transaction was upon a good and valuable consideration. As regards the making of the contract itself, she occupies the situation of one who buys from a fraudulent debtor, or contracts with him for property which might otherwise be subjected to the demands of his creditors. In this relation she ought to show not only that the contract was made upon a valuable consideration, but also that it was without notice of the fraudulent intent on his part. To this extent, in my opinion, the burden of proof was clearly upon her. 1 Bigelow on Frauds, 130–2; 2 Id. 487; *Brown* v. *Cactus Hedge Co.*, 64 Tex. 396; *Hough* v. *Dickinson*, 58 Mich. 89.

It will be remembered that for more than ten years this contract remained in force without an accounting under it. Not one dollar had ever been demanded or received upon it.

Under all the circumstances of the case, I am of the opinion, that in claiming to have received the money in part discharge of the debt attempted to be created by this contract, she is charged with the burden of proving the fairness of the transaction by which she alone of all the creditors obtained payment from the insolvent. In other words, having received the money in the payment of a debt, it became her duty to prove, with reasonable satisfaction, that

she did so in the attempt to collect dues under a contract the continuing validity and obligation of which she maintained, and the collection of which she made as a *bona fide* creditor merely, and not to assist she debtor in an attempt to defraud other creditors. *Klein* v. *Hoffheimer*, 132 U. S. 367, 376; *Clements* v. *Moore*, 6 Wall. 299, 315. I think the defendant has wholly failed to make out a defense.

Joseph W. Parish answered the original bill under oath, though the same had been expressly waived, and made the following statement concerning the purchase of the property: "The purchase money and consideration for said real estate was the private means of the said Emily E. Parish, said money being by her earned as the result of her own labor after she became of age, and your respondent had no interest therein whatever and no claim therefor."

In her answer to the amended bill, Emily E. Parish said: "She did receive a certain sum of money from her father, being the fund or part of the fund with which said property was purchased, but she says said money was due her by virtue of a certain contract or agreement set out in the answer of said J. W. Parish." It will be observed that the nature, terms and conditions of this contract were not stated. These were only elicited by the examination of the said Emily E. Parish. She said that in September, 1875, her father promised to support her and pay her $50 per month for remaining with him and caring for her mother, who was afflicted with some heart trouble. She was then eighteen years of age, and was of the impression, and so remained, it would appear, until her examination, that she was then "of age," in the legal sense of the word. Subsequently she was recalled on her own behalf, and gave the origin of this contract as follows: "I wanted to obtain employment in one of the departments, and wrote an application and gave it to my father. Through his influence I thought he could secure me a place; and he told me that he would rather I would not do anything of the kind, but

4 Ct. App.—15

stay at home, and attend to my mother and the house, and he would give me $50 per month and my support. I then decided to accept his agreement, and gave up all intention of ever trying to obtain employment in the departments, and I devoted myself to my mother and my home duties."

In my opinion, the foundation for this contract does not strengthen defendant's case. Here was a daughter, lacking three years of the attainment of her majority, whose natural duty it was, especially under the circumstances, to remain with her family. Yet she proposed giving up the care of her mother, and the management of the household for employment in a Government office, and was only induced to remain by the promise of no inconsiderable pecuniary reward. The contract was apparently made as between strangers; no sentiment seems to have entered into it. Notwithstanding this, no arrangement seems to have been made to secure the payment for the services either by month or year. She performed her part of the contract faithfully for more than ten years before one dollar was ever paid her. No accounting was ever had, and no attempt seems ever to have been made to collect even a portion of her dues during this period. The business part of the transaction was confined exclusively to the making of the contract. In June, 1886, her father turned over to her $5,000 out of funds collected from the Government. At this time, counting the three years of her minority, the salary due her amounted to about $6,400. Excluding these years, it would amount to about $4,600. I concur, without question, in the proposition that a father, though insolvent, may emancipate his minor child, and that his creditors would have no right to subject her earnings to the payment of their demands. Any other doctrine would savor of human slavery. But I do not agree that he can first emancipate a child from the performance of a proper and necessary service to himself, and then immediately contract with the same child for the same service at an arbitrary price, and

devote to its payment money that ought to go to his creditors. *Dick* v. *Grissom*, 1 Freeman, (Miss.) 428. If he could contract to pay $50 per month, why not $100 or more?

There is no proof with respect to the reasonableness of this contract. Viewed as a contract for personal services between party and party, the compensation would seem to be very liberal, still it is not so great as to shock the conscience at a glance. The possibility of such contracts with children, either before or after majority, is enough to suggest that they cannot be left to the will of the makers thereof, but must be matters of inquiry and revision by courts of equity, in the interest of justice and fair dealing.

I pass now to the consideration of some other features of the case. Four thousand five hundred dollars of the money so disposed of was invested in the house and lot. The vendors, Gist and wife, conveyed the property to Jonas H. McGowan, October 25, 1887, for $4,500 in cash furnished by defendant, and $2,000 in notes secured by trust deed thereon. In her statement of this purchase, Miss Parish testified that McGowan purchased the property before she purchased it of him, and that he did not purchase it for her. She further said that he bought on condition that she might have the property if she liked it; if not, he would keep it. That she looked at the house, liked it, and then bought it of McGowan, giving him $4,500 in cash and notes for $2,000. His contract with her for sale at this price bears date November 18, 1887. She further stated that McGowan bought for himself; that she had no conversation with him before he did so; and explained that when she had said that he bought upon condition that she might have the property if she liked it, she had used the wrong word.

McGowan, however, testified, that Miss Parish came to him, told him she had $4,500, and wanted to buy a house at from $6,000 to $7,000, if she could arrange for the difference. He said to her: "Find some place that you think will be satisfactory to you, then see me again, and I will do

what I can to help you." The reason he gave for the purchase in his own name for her is: "Because Miss Parish said: 'I have not money enough to pay for this; I will want more money than I have, and do not know how to take care of this margin.' She said to me: 'I do not want to get into any scrape with my father's creditors; he is always getting into scrapes, and unless I have a clear title to this home of mine, I may be entrapped by some of father's creditors in some way.'" McGowan was her father's attorney in some of his claims, and furnished him desk room in his office.

I can readily appreciate the motive for keeping the transaction concealed from these troublesome creditors. It is consistent with that which I conceive to be the purpose of the whole transaction. But I am unable to perceive why her inability to pay all the purchase money in cash would be any reason for using the name of McGowan instead of her own, for it does not appear that the personal liability of McGowan was any part of the consideration to the vendors, or that they were not perfectly content with their lien after receiving $4,500 in cash. In this connection it may be remarked, too, that neither the contract with McGowan, nor his deed to her when she completed the payment, was recorded. The entire Parish family moved into the house, but there was nothing to indicate that they were not tenants of McGowan, instead of owners of the property. The failure to record the deed may have been through carelessness as claimed, but the omission to do so was very much in the line of the wish to "avoid scrapes" with creditors.

Shortly after the purchase of the house it was repaired, at the request and upon the order of Parish, by the consent and in the name of McGowan. The cost of repairs seems to have been from $600 to $700, and was paid by Parish himself. Miss Parish had nothing to do with it, and could not tell the cost. The father also kept the taxes paid up. How much he thus paid she could not tell, for it appears that

there had still been no accounting whatever between them. McGowan testified that he collected, as attorney for J. W. Parish, in May, 1889, $18,500 from the Government; but upon suggestion of defendant's counsel, refused to disclose what amount of this he paid over to Parish. He explains the payment of the lien on the house out of this fund as follows: "I called Mr. Parish's attention to the matter, and said to him: 'Now, you admit that you owe this girl money, and this money is in my hands; you had better authorize me to pay these notes from the money in my hands now,' and he said, 'Go ahead and do it.'"

Altogether, defendant received from her father $7,000 in cash, about $600 or $700 in repairs upon the house, and the taxes for a number of years. By leasing the house to him for a residence at a liberal sum, she could, with her continuing salary, make a safe depository for other large collections which he might make at subsequent periods.

In arriving at my conclusion, I do not find it necessary to say that this extraordinary contract was not made in September, 1875, as alleged, or that it was concocted as late as 1886 or 1887, when the purchase of the house was contemplated. What I do maintain is—granting it was actually made as claimed—that it was not conceived in good faith, but was devised by an insolvent debtor, in anticipation of the receipt of the money from the Government, as the best means through which it could be kept from the grasp of his numerous creditors.