# MAGRUDER *v.* MONTGOMERY.

---

EVIDENCE; RES GESTÆ; FALSE REPRESENTATIONS; PLEADING; WITNESSES.

1. In an action by a purchaser of corporate stock to recover damages for false representations as to its value, alleged to have been made by the defendant, the president of the corporation, statements made by the plaintiff in his first interview with the defendant, which culminated in the purchase of the stock, that he wanted to be very careful about investing his money, and giving the reasons, are admissible in his behalf as part of the *res gestæ,* and a statement made by him at the same time that the amount invested was all he had is also admissible as tending to show that he relied upon the defendant's representations.

---

*See also S. C. 17 App. D. C. 269.—Reporter.

2. Where one of the counts of a declaration in an action to recover damages for alleged false representations by the defendant as to the value of corporate stock purchased by the plaintiff, and which turned out to be worthless, is based upon the theory that the defendant, although not having actual knowledge of the financial condition of the corporation, recklessly and negligently represented that he had, and there is evidence that the defendant represented that the corporation had abandoned its former business, and had purchased and was about to operate another business that had yielded quite a profit the preceding year, the trial court properly refuses to direct a verdict for the defendant on such count.

3. In an action against the former president of an insolvent corporation by a purchaser of some of its capital stock to recover damages for alleged false representations as to its value, letters from the plaintiff to the defendant, offered in evidence by the defendant, are admissible, which tend to show that the plaintiff's motive in investing his money in the stock was one not disclosed in his testimony, namely a desire to secure the employment of his son by the company; and a letter is also admissible in evidence against the plaintiff, in which he stated that he "understood" that the company was on a paying basis, where his oral testimony was positive and unequivocal that the defendant represented that it was on such a basis and that the investment would be perfectly safe.

4. In a case depending largely on the testimony of the plaintiff and the defendant, any statement made by either in respect to the controversy, which sheds any light on the disputed questions, and which in any way modifies or is inconsistent with the testimony given by such witness, should be admitted.

No. 1920. Submitted January 8, 1909. Decided April 6, 1909.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for alleged false representations.

*Reversed.*

The COURT in the opinion stated the facts as follows:

By this appeal appellant, G. Lloyd Magruder, seeks a reversal of a judgment entered against him for $3,000 and interest.

The declaration is in two counts; the gravamen of the first count being that the defendant wilfully misrepresented the con-

dition of the Standard Dairy & Ice Company, a corporation of which he was the president. The gravamen of the second count is that the appellant was bound to know the condition of said company, and, although not actually possessing such knowledge, recklessly and negligently represented that he did. Each count states that appellee relied upon the representations of appellant, and was thereby induced to purchase thirty shares of the company's stock for $3,000, which was lost by the subsequent insolvency of the company.

In about 1903 the American Butterine Company, a corporation, was formed and engaged in the butterine and ice business. Appellant was president of the company. Under date of January 21, 1905, appellant in substance reported to the company that the butterine business, which was the company's main business, had been unprofitable, and that the ice business had been profitable; that there had been a net loss of over $15,000; and that the board of directors had voted to discontinue the manufacture of butterine and to increase the capacity of the ice-making part of the company's plant. The report closes with a statement that, inasmuch as the receipts from the ice business would be $4,500 per annum less than the fixed charges and expenses, some further enlargement of the business of the company would be essential "in order to eventually place our property on a financially paying basis." Therefore it was decided to embark in the dairy and ice business, and the name of the company was changed to the Standard Dairy & Ice Company. About April 1, 1905, the ice plant was enlarged and the Ashburn Farm Dairy was purchased. There was some evidence that this dairy had yielded quite a large profit the preceding year. The new business of the company, however, was no more successful than the butterine business had been. No profits were ever realized, and, in a comparatively short time, the company became financially embarrassed and was forced into bankruptcy.

The appellee, during the period covered by these acts, was a clerk in the Bureau of American Republics, and had a wife and son. The son had studied steam engineering and was desirous

of obtaining employment. In some way Mrs. Montgomery, wife of appellee, learned that there was a possibility of securing the position of assistant engineer for the Standard Dairy & Ice Company, and consulted appellant about the matter. As the result of this conversation appellee testified that early in April, 1905, "he went to see the defendant in order to try to get a position for his son;" that the defendant stated the Standard Dairy & Ice Company was a new company, organized in the District of Columbia to sell milk, ice, and dairy products; that it was a fine business and was already on a paying basis and was earning 20 per cent; that in about two years it would earn about 50 per cent; that Mr. Shafer's dairy (the Ashburn Farm Dairy) had been purchased, and that Mr. Shafer would be the manager of the milk department of the company; that the defendant urged plaintiff to invest in the stock of the company; and that plaintiff told defendant he could not then decide about investing money in the company. Over the objection and exception of the defendant, plaintiff was permitted to testify that he also told defendant that the money he had for investment had come to him in a way that he did not want to lose it; "that $2,000 of this money was borrowed money, and that a mortgage had been put on our house to raise it, and that I wanted to be very careful about investing it, because I wanted to have the money on hand when the mortgage fell due;" that the defendant assured him the investment was perfectly safe; that the plaintiff telegraphed for his son, who subsequently was given employment by the company; and that in consequence of what the defendant had told him the plaintiff purchased thirty shares of the company's stock, for which he gave the defendant $3,000, which was wholly lost.

During his testimony the plaintiff was permitted to state, over the objection and exception of the defendant, that the $3,000 with which he purchased this stock was all he had.

The defendant denied making misleading or false statements to the plaintiff, and offered in evidence several letters which he had received from the plaintiff, and to which further allusion will be hereinafter made.

*Mr. J. J. Darlington* and *Mr. R. B. Behrend* for the appellant.

*Mr. Charles A. Keigwin* and *Mr. James S. Easby-Smith* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

The first assignment of error relates to the admission of evidence of the pecuniary condition of appellee. The statement of appellee in his first interview with appellant, which culminated in the purchase of the stock, that he wanted to be very careful about investing the $3,000, for the reason given, was clearly admissible as a part of the *res gestæ.* This conversation was intimately connected with the subject under discussion, and led to the consummation of the transaction. It was a part of the negotiations resulting in the purchase of the stock. Having stated to appellant the reason for caution in making this investment, we see no error in permitting appellee to state that the amount invested was all he had. This statement could not enhance the damages by arousing the sympathy of the jury, for, if the appellee was entitled to recover at all, he was entitled to recover the specific amount of $3,000 and interest. To entitle him to a recovery it was incumbent on appellee to show that appellant had made statements concerning the condition of the company, and that he relied thereon. We think this testimony tended to show appellee did rely upon the statements made to him by appellant, and, in that view of the case, was competent.

*Thorn* v. *Helmer,* 2 Keyes, 27, was an action by one physician against another for damages for a fraud involved in the sale of an interest in defendant's practice. The plaintiff was permitted to testify in respect to the value of his professional business at the place in which he formerly lived. This was assigned as error, and the court of appeals, in passing upon the question, said: "It may be conceded that the evidence was inadmissible on the question of damages; and so the judge, unsolicited, in-

structed the jury. But, I think, it was competent in another point of view. To make out the plaintiff's case, it was necessary to prove that he relied upon the defendant's representations; and this could be done by direct evidence or by circumstances tending to show such reliance. In this latter class the proof falls."

The second assignment of error is based upon the refusal of the court at the close of the evidence to direct a verdict for the appellant on the second count. The ground of this motion was that the evidence clearly showed knowledge on the part of appellant of the condition of the company, and that, therefore, a count based upon the theory that he did not actually have such knowledge would not sustain a verdict. Without deciding the precise question stated, we hold that there was evidence before the jury to sustain a verdict under the second count. While it is true that the record shows beyond question that the business in which the company previously had been engaged was unprofitable, the evidence leaves no room for doubt that appellant stated to appellee that the company was about to embark, or had embarked, upon a new business; that it had abandoned the butterine business, which, up to that time, had been the source of the loss, that it had enlarged the ice plant, which, up to that time, had been a source of profit; and had purchased, was then operating, or was about to operate, a dairy that had yielded quite a large profit the preceding year. From this evidence the jury well might have hesitated to find that appellant wilfully misstated the condition of the company. They evidently reached the conclusion that the statements he did make as to the profits that were then accruing to the company were the result of negligence, and not of intent to deceive.

The third assignment of error challenges the ruling of the court in refusing to admit in evidence the letters hereinbefore mentioned. In this ruling we think there was error. The letters were dated June 24, July 12, July 31, and September 12, 1905, respectively.

In the letter of June 24th appellee said (*inter alia*):

"You will remember that in April last I made an agreement

with you, as president of the Standard Dairy & Ice Company of this city, for the employment of my son at the works of said company in Langdon, District of Columbia. Under the terms of this agreement I was to take $3,000 worth of the stock of the said company, which company, you stated, was then on a paying basis, and my son was to be given employment with an opportunity to learn the business of the said company, step by step, in all its details, from the beginning to the end, and was to be advanced as rapidly as possible.

"Our preliminary agreement or understanding was that the young man was to enter the employ of the company in the capacity of assistant engineer. In order to do this, however, he required a license to exercise this calling in the District of Columbia, issued under the authority of the commissioners of the District. On applying for this license he failed to pass the examination, and the license was not granted him. I informed you accordingly, and stated that, owing to the inability of my son to procure a license to do this work, the original arrangement or preliminary agreement could not be carried out, and I therefore declined to invest any money in the stock of the Standard Dairy & Ice Company. I also informed you that my son was just out of school and had had no practical experience in the dairy and ice business, stating at the same time his qualifications, and showing you his diploma. You then said that there was plenty of other important work that my son could do at the plant, and offered him employment at the same salary, and stated that he would be given an opportunity to learn every portion of the business of the Standard Dairy & Ice Company, and promised to give him the electrical and chemical work of the company. You spoke in glowing terms of the prospects of the company, and stated that, notwithstanding the fact that all the machinery had not been installed or even received, and regardless of the circumstances that the company had but recently commenced to do business, that it was then on a paying basis, and added that there was plenty of work for my son at the plant.

"On these representations your offer was accepted; and, in compliance with my part of the agreement, I invested $3,000

in the stock of the Standard Dairy & Ice Company, paying you cash for the same, and you placed my son in the plant at Langdon, District of Columbia, to learn the business in accordance with our agreement."

After detailing the difficulties and misfortunes experienced by his son during his employment by the company, the letter continues:

"These are the facts; I make no comments upon them; you can draw your own conclusions. I consider this a gross breach of our agreement. What do you think about it? Please let me know as soon as possible. Could you not sell my shares for me? If necessary, I would be willing to let them go at a slight discount. Please write me, stating what you think is the best thing for me to do under the circumstances. I have depended entirely on you in this matter, and have made my arrangements with you, which arrangements your manager claims to know nothing about. I am very much surprised and annoyed at the treatment I have received at the hands of your manager, and should be glad to hear from you regarding the matter."

In the letter of July 12th the appellee stated (*inter alia*):

"I have been waiting and my son has been waiting patiently for these gentlemen to comply with their promise in this respect, both my son and myself having fulfilled our part of the agreement. Instead, however, of putting my son to work, as the aforementioned gentlemen promised and agreed to do, one of them, Mr. Berliner, informed my son on the 10th instant, that no action would be taken until your return here.

"I think you will agree with me that this is an open and flagrant violation of my agreement with you and with them. It seems to me that the Standard Dairy & Ice Co. has utterly failed to live up to your agreement with me, and has wilfully violated the same; even deliberately disregarding and infringing their own interpretation of the agreement.

"Now, I have not lost my faith in you. I believe that you intended to observe your agreement with me, and that your motives were good. If you were here you could doubtless settle this affair to the satisfaction of all concerned; but you are away,

and I am not satisfied to leave the matter in its present shape until your return, so I am going to ask you to try and see if we cannot come to some equitable settlement by correspondence. Won't you kindly write me fully and without delay?

\*      \*      \*      \*      \*      \*      \*      \*

"How do you think this difference between us should be settled? It seems to me that it would be only fair, under the circumstances, for my money to be returned to me and the whole arrangement canceled. Are you willing to return the money? Please answer as soon as possible and state just what you are willing to do."

In the letter of July 31st appellee said (*inter alia*):

"I feel sure that you wish to do what is right and fair and honorable in this transaction. That is what I am anxious to do and what my son desires to do, and I hope that when I present the question in this light to the Standard Dairy & Ice Company, that it will be convinced that it is just to settle the matter at once and will be willing to make an equitable arrangement satisfactory to all concerned."

In the letter of September 12th appellee stated (*inter alia*):

"Referring to our conversation of this morning, in which you said, in explanation of the meaning of the sentence, 'Some of your statements in regard to what I said and promised are not exactly correct,' contained in your letter of July 13, 1905, in answer to my letter of June 24th of the same year, and which sentence was quoted to you in my letter of July 31st last, that what you meant by the aforementioned sentence was that the phrase in the first paragraph of the second sentence of my letter to you of June 24, 1905, reading '\* \* \* which company you stated was then on a paying basis \* \* \*' was a misunderstanding of what you said, I beg to state that I understood you to make that statement."

These letters, we think, tend to show a motive on the part of appellee in investing his money in the stock of the company, —a motive not mentioned by him in his testimony. As we read them, these letters at least indicate that appellee was much more concerned, when he made this investment, about obtaining

employment for his son, than he was to secure a large return on his money. The jury reasonably might infer that appellee was willing to take some chances on an investment of $3,000 if, in so doing, he could secure permanent employment for his son, whose career was yet to be made. We do not, of course, intimate that the jury ought to take such a view of the evidence. It is quite enough to state that they might do so.

The letter of September 12th is admissible on another ground. In that letter appellee wrote that he *understood* appellant to state that the company was on a paying basis. This rather conservative statement concerning appellant's representations should have gone to the jury along with appellee's positive and unequivocal oral testimony. In a case depending so largely on the testimony of two witnesses, any statement made by either in respect to the controversy which sheds any light on disputed questions, and which in any way modifies or is inconsistent with the testimony given by such witness, should be admitted. The jury might reach the conclusion that this letter was merely a courteous expression of the statements contained in appellee's testimony, but, on the other hand, the jury might conclude that the changed conditions resulting in the litigation might have influenced the appellee and caused a quickening of his memory.

For the reasons stated the judgment must be reversed, with costs, and the cause remanded with directions to grant a new trial, and it is so ordered.                    *Reversed.*