## PUBLIC MOTOR SERVICE, Inc., et al. v. STANDARD OIL CO. OF NEW JERSEY.

### No. 6657.

United States Court of Appeals for the District of Columbia.

Decided June 20, 1938.

George E. Edelin and Theodore D. Peyser, both of Washington, D. C., for appellants.

Walter C. Clephane, J. Wilmer Latimer, and Gilbert L. Hall, all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

## STEPHENS, Associate Justice.

This is a suit upon a promissory note brought by the appellee, Standard Oil Company of New Jersey, a corporation, as payee, against the Public Motor Service, Inc., a corporation, as maker, and the appellants, Paul B. Cramer, Joseph H. Nicholson and Grace E. Nicholson, as endorsers. The Public Motor Service, Inc. (hereafter referred to for convenience as Motor Service) defaulted below and is not concerned in the appeal; reference to the appellants hereafter is meant to include only the three individuals named. The appellants admitted that they had signed the note as endorsers. They defended upon the single ground that fraud had been used in procuring their signatures. The case was tried on the merits to a jury and at the close of the evidence the trial judge granted a motion made by the appellee for a directed verdict for the full amount sued for with interest.[1] This appeal was then taken. The only question involved in it is whether or not the trial court properly granted the appellee's motion, that is to say, whether or not there was in the case sufficient evidence of fraud in obtaining the appellants' signatures to take the case to the jury.

In support of their pleas of fraud the appellants introduced evidence to the effect that: Motor Service operated three gasoline stations in Washington and one in Virginia. Cramer was its president and a minor stockholder. Grace E. Nicholson was the controlling stockholder and had furnished the money for the formation of the company. Joseph H. Nicholson was the husband of Grace E. Nicholson; he had no financial interest in the company. Motor Service was in business in the years 1931 to 1933, and from about May 1, 1931, to November 23, 1933, it purchased its gasoline and oil exclusively from the appellee—about 20,000-25,000 gallons of gasoline a month. But it had become seriously in arrears in moneys owing to the appellee for gasoline and oil, and representatives of appellee presented the note in suit as evidencing the amount due on the date thereof, October 10, 1933, and demanded that as a condition upon the extension of further credit to Motor Service the note be executed by it and endorsed by the appellants. For the reasons hereafter set forth, the face of the note did not represent the exact amount due upon October 10, 1933, and had the appellants known this they would not have endorsed it.

Throughout the business dealings between Motor Service and the appellee there had been a question about a gasoline shortage noted at the service stations. This shortage commenced as early as the first month of Motor Service's business. The appellee had aided in attempting to find the cause of the shortage by sending auditors during a period of three months to go over the accounts of Motor Service and by testing the tanks and pumps of Motor Service. It was suspected that some of the employees of Motor Service were responsible for the shortage. No test was made of the tank trucks, in which deliveries of gasoline and oil were made by the appellee, before the execution of the note. But in November, 1933, one of the Washington stations of Motor Service was leased to a concern named Hill & Tibbitts, and Cramer was hired by this concern to operate the station. Like Motor Service, Hill & Tibbitts bought all of its gasoline from the appellee, and Hill & Tibbitts also noticed a gasoline shortage in its accounts. It had its pumps and tanks tested by the District of Columbia and they were found correct. It then occurred to Hill & Tibbitts to ask for a check upon the accuracy of the tank trucks of the appellee, which were the same tank trucks that had been serving the stations of Motor Service. This test, the exact date of which does not appear, was made by bucketing off the compartments of the tank trucks through a measure certified by the District of Columbia, and it was dis-

---

[1] The face of the note was $18,906.79. Interest was at 6%. There were admitted payments amounting to $588.72. The appellee had credited a further sum of $113.18 "in settlement of overcharges." According to the replications to the pleas of fraud, the appellee had discovered, in January, 1934, an inaccuracy in one of its tank trucks amounting to 12½ out of a total of 2065½ gallons, and the credit was to compensate for the effect of this to overcharge the Motor Service. The appellants joined issue, however, on the replications. As we note below, no evidence was introduced, by either appellee or appellants, showing the exact shortage and consequent overcharge.

covered that the compartments were inaccurately marked. They were from 5 to 9 gallons short per compartment. No evidence was introduced tending to prove that the appellee knew, prior to this test, of inaccuracy in the marking of its tank truck compartments. No evidence was introduced showing the amount by which the Motor Service had been overcharged as a result of inaccuracy in the compartment markings.

We think that the trial court correctly ruled that there was insufficient evidence of fraud to take the case to the jury. The rule is settled that in an action at law where the issue is fraud the party relying upon fraud must show that the misrepresentations asserted were made either with knowledge of their untruth or in reckless disregard of the truth. New York Title & Mortgage Co. v. Hutton, 63 App.D.C. 266, 71 F.2d 989, certiorari denied 293 U.S. 605, 55 S.Ct. 122, 79 L.Ed. 696, 1934. In that case Hutton had bought stock in the Capitol Title & Guarantee Company, Inc., a Washington title-searching concern, upon the faith of a letter written by the solicitor of the New York Title & Mortgage Company, an affiliated title guaranteeing concern, for the purpose only of aiding the Capitol Title & Guarantee Company to get business. The letter lauded its title searching plant. Hutton sued the New York Title & Mortgage Company in deceit, alleging that by reason of the statements in the letter, as a procuring cause of purchase of the stock, she suffered loss. For error in denying a motion by the New York Title & Mortgage Company for a binding instruction we reversed the trial court and returned the case for a new trial. In so doing we ruled also, for the guidance of the trial judge in the new trial, that further error had been committed in refusing to permit the solicitor of the New York Title & Mortgage Company to testify as to his belief in the truth of the statements contained in the letter. In this connection we said, speaking through Associate Justice Groner:

"The action here was deceit, and on such an issue misrepresentations believed to be true, though the result of ignorance or negligence, will not sustain the action. No doubt a false statement *recklessly* made without knowledge of its truth or falsity is actual fraud, but in that case there must be knowledge of the falsity, or *reckless* disregard of the truth, to justify saying the misrepresentation was fraudulent." [63 App.D.C. 266, at page 271, 71 F.2d 989, at page 994]. [Italics supplied]

It is settled also that fraud must be shown by clear and convincing evidence—Security Investment Co. v. Garrett, 1894, 3 App.D.C. 69, 76; McDaniel v. Parish, 1894, 4 App.D.C. 213; Magaw v. Huntley, 1910, 36 App.D.C. 26; Lalone v. United States, 1896, 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425; Fidelity & Casualty Co. v. Genova, 6 Cir., 1937, 90 F.2d 874; 5 Wigmore, Evidence (2d ed. 1923) § 2498—and by evidence which is not equivocal, that is, equally consistent with either honesty or deceit—McDaniel v. Parish, supra; Security Investment Co. v. Garrett, supra. It is said in Milson v. Gerstenberg, 1915, 43 App.D.C. 165, 175, that "Fraud may be established by preponderance of evidence reasonably sufficient to satisfy the minds of the jury." But this statement was based upon authorities cited from other jurisdictions[2]

---

[2] The cases cited in Milson v. Gerstenberg were: Gordon v. Parmelee, 1860, 15 Gray 413, 81 Mass. 413; Eames v. Morgan, 1865, 37 Ill. 260, 262; Burr v. Willson, 1875, 22 Minn. 206; Knowles v. Scribner, 1869, 57 Me. 495; Sparks v. Dawson, 1877, 47 Tex. 138; Jones, Stranathan & Co. v. Greaves, 1875, 26 Ohio St. 2, 20 Am.Rep. 752; Lee v. Pearce, 1873, 68 N.C. 76; Catasauqua Mfg. Co. v. Hopkins, 1891, 141 Pa. 30, 21 A. 638; Adams v. Thornton & Wellborn, 1885, 78 Ala. 489, 56 Am.Rep. 49. Examination of these cases discloses that the basic issue in each of them was whether a party alleging fraud had to prove his case beyond a reasonable doubt, since he was charging criminal conduct. In each case it was held that in a civil case, fraud did not have to be proved beyond a reasonable doubt. But the courts which went on to discuss what degree of proof was necessary, differed in their conclusions. In Gordon v. Parmelee, Sparks v. Dawson and Lee v. Pearce, it was said that a mere preponderance of the evidence was sufficient to sustain an allegation of fraud, while the courts in Knowles v. Scribner, Jones, Stranathan & Co. v. Greaves, Catasauqua Mfg. Co. v. Hopkins, and Adams v. Thornton & Wellborn thought that more than this was necessary. In Eames v. Morgan, only the trial court made any reference to the question; it said that a mere preponderance of the evidence was sufficient. But

and was made without reference to the previous rulings of this court in Security Investment Co. v. Garrett, McDaniel v. Parish, and Magaw v. Huntley, supra, and without reference to the ruling of the Supreme Court of the United States in Lalone v. United States, supra. We therefore overrule what was said in Milson v. Gerstenberg on this subject.

Since there was no evidence tending to prove that the appellee knew, prior to the test above referred to, of the inaccuracy in the markings in its tank truck compartments, there was nothing to show that it had any actual knowledge that the face of the note represented at the time of its execution, because of the inaccuracy in the compartment markings, a sum greater than the amount actually due from Motor Service. Therefore there was no evidence of knowledge of an untruth in the representation of the amount due. Furthermore, there was no substantial evidence of a representation made in reckless disregard of the truth. The mere fact of inaccuracy in the markings, without any showing that the appellee had some reason to question their accuracy, is not substantial evidence of recklessness, much less clear and convincing proof thereof.

On what constitutes sufficient evidence of recklessness of the truth to take an issue of fraud to a jury there are many decisions. But each case must be determined on the basis of the evidence in it; and as there is usually such difference between cases that a ruling in one on the question of the sufficiency of evidence is not highly persuasive in respect of another, we think it not useful to review the decisions in any detail. Reference may be made, however, to Alpher-Kur-Greenberg Co. v. Holober, 1924, 54 App.D.C. 236, 296 F. 983, a case not greatly dissimilar to the instant case, wherein we held that evidence, at least as persuasive of recklessness of the truth as the evidence here, was insufficient to warrant submitting an issue of fraud to the jury. In that case the defendant (Henry Holober) was an accommodation endorser upon promissory notes of which his brother-in-law (I. Holober), a retailer of jewelry,

was the maker. The notes had been given in payment for jewelry sold to the maker by the plaintiff, a wholesaler. The defendant pleaded partial non-delivery of goods, return of a part of the goods, and fraud, alleging that the plaintiff had charged 300% when he said that he was going to treat the maker of the note "right", and alleging that the merchandise was supposed to be gold whereas some of it was brass. The evidence on the first point was that, after purchase, the maker of the note told the plaintiff—"I am overcharged between 100 and 350 per cent." The evidence on the second point was that the maker of the note learned that some of the articles were brass when a customer of his own returned a chain sold as gold which was brass. Although it is not set forth in the opinion, there was apparently also evidence of a confidential relationship between the plaintiff and the two Holobers. The trial judge instructed the jury that the verdict should be for the plaintiff for the amount sued for, less the price of goods not delivered, if any, and less the price of goods returned, if any, to the plaintiff, and agreed by him to be credited on the notes, "provided the jury believe from the evidence that no fraud was perpetrated by the plaintiff in the transaction." Because of that part of the instruction quoted, we reversed, saying:

"That there was a confidential relation between plaintiff ... and the two Holobers may be admitted, but what evidence is there to warrant the inference that the relation had been sinned against. There is no proof that the goods had been sold at an unreasonably high price. The testimony that Holober [the maker of the note] had declared to Kur [the plaintiff], 'I am overcharged between 100 and 350 per cent,' is not equivalent to testimony that he had been so charged. He might have told the truth when he said that he had made the statement to Kur, but the fact that he did so would not be proof that the statement was true. In another place he said:

"'The first instance I found that articles had been sold to me for gold were

a recent case in the same jurisdiction has held clear and convincing evidence to be necessary. Kuska v. Vankat, 1930, 341 Ill. 358, 173 N.E. 343. The court in Burr v. Willson confined itself to holding that in a civil case it is not necessary to supply the degree of proof required in a criminal action. In the same jurisdiction it has since been held that clear and convincing evidence is necessary. First Nat. Bank of Breckenridge v. Schroder, 1928, 175 Minn. 341, 221 N.W. 62.

brass was when a customer * * * had been in and bought a chain supposed to be solid gold, which had·been sold to me as solid gold, and charged the price of solid gold.'

"He does not say that the chain was not exactly what it was supposed to be. True, he does say that it was then he learned for the first time that articles sold to him for gold were brass. While this is not a direct statement that they were brass, perhaps it warrants the inference that they were. But he does not tell us how many articles there were, or whether they were worth 5 cents each, or $1 each. Certainly this was not enough on which to base a finding of fraud, in view of the fact that an expert put upon the stand by defendant . . . had testified that he could not tell by looking at it whether a piece of goods was solid gold, gold plate, or brass—that jobbers accepted the word of the manufacturers as to the quality of the goods. If the goods were not as represented, that might be ground for rescission, but, taken alone, would not be proof of fraud. If the goods referred to were brass, there is nothing to show that the plaintiff . . . knew it, or that the delivery of them was not the result of an innocent mistake. The defendant . . . says that, if he had known the plaintiff . . . . had charged his brother-in-law 300 per cent on·his merchandise, he would not have signed the notes. This, however, is not the same as saying that he had charged that much.

"It may be that the records disclose a scintilla of evidence indicating fraud; but, if so, that would not be enough to sustain a verdict of wrongdoing. [Authorities cited] . . . A careful scrutiny of the records has failed to reveal sufficient evidence upon which to predicate verdicts to the effect that fraud had been committed upon the defendant . . . ." [54 App. D.C. 236, at pages 238, 239, 296 F. 983, at pages 985, 986]

Reference may be made also to Pittsburgh Life & Trust Co. v. Northern Central Life Ins. Co., 3 Cir., 1906, 148 F. 674. There the defendant induced the plaintiff to become ·reinsurer of certain of the defendant's insurance policies. It did so by means of written representations to the effect that it had valid claims against its agents in a sum named, that it had collected no premiums due after a given date, and that. the reserves required upon the policies were not in excess of a given amount. All of these statements were incorrect. In an action of deceit the plaintiff was non-suited by the trial judge, and the Circuit Court of Appeals affirmed. It said:

"But we think the case is utterly barren of any evidence which would justify such an inference [of intent to deceive and injure the plaintiff]. It does not appear by whom the statements were prepared. The evidence, as it stands, proves that they were incorrect, but they were prepared some years before the plaintiff was organized and while the defendant was carrying on its business without any purpose of disposing of it, and were relied on as correct by the defendant in the transaction of its own business. Presumably the errors were the result of carelessness on the part of bookkeepers or other subordinate employees of the defendant. The proofs in the case fail to show that any of the officers of the defendant with whom the plaintiff carried on its negotiations . . . had any knowledge whatever that the statements were incorrect, and there is nothing showing or tending to show that there·was any intent on the part of any of those officers, or indeed, of any of the employees or agents of the defendant to deceive the plaintiff." [148 F. 674, at page 676]

See also Lalone v. United States, supra; National Bank of Commerce v. Rockefeller, 8 Cir., 1909, 174 F. 22; Fricke v. International Harvester Co., 8 Cir., 1917, 247 F. 869; Portland Morris Plan Bank v. Winckler, 1928, 127 Me. 306, 143 A. 173; German Savings Bank v. Geneser, 1902, 116 Iowa 119, 89 N.W. 201.

We have considered the cases cited by the appellants. Most of them are from other jurisdictions and on that account not controlling. Moreover, all of them differ so materially from the case at bar that they are not persuasive, and we think it would serve no useful purpose to review them in detail. Some of them reflect rules not applicable to the facts in the instant case, such as the rule that in suits for equitable relief, for example rescission, innocent mistake alone is a sufficient predicate. McMullin's Adm'r v. Sanders, 1884, 79 Va. 356, 364. One of them, Knudson v. George, 1914, 157 Wis. 520, 147 N.W. 1003, holds that negligence is a sufficient·predicate for "fraud" in the presence of a fiduciary or special re-

lationship between the parties. A number of the cases are decided under the general rule that it is fraudulent for a person to make misrepresentations of material facts, assuming or intending to convey the impression that he has actual knowledge of the existence of such facts, when he is conscious that he has no such knowledge. See Lehigh Zinc & Iron Co. v. Bamford, 1893, 150 U.S. 665, 14 S.Ct. 219, 37 L.Ed. 1215; Barnes v. Union Pac. Ry. Co., 8 Cir., 1893, 54 F. 87; Browning v. National Capital Bank, 1898, 13 App.D.C. 1; Milson v. Gerstenberg, supra; Magruder v. Montgomery, 1909, 33 App.D.C. 133. Lehigh Zinc & Iron Co. v. Bamford and Milson v. Gerstenberg are cited, among other cases, as evidencing that an action for deceit will lie where a vendor makes, intending that they shall be acted upon, material, untrue representations in respect of his own business or property, if the representations are such that he is bound, or must be presumed, to know the truth thereof. But a rule so stated is significant not *in abstractu,* but only when looked at in the light of its application to the facts of a particular case. In Lehigh Zinc & Iron Co. v. Bamford there were involved direct and positive representations by the lessor of a mine that it was valuable and ore producing and that it had yielded, and, properly worked, would yield, a large amount of metals. In Milson v. Gerstenberg there were direct and positive representations by the stockholders of a pump company that a pump being exploited by the company had actually been tested by government engineers and found to require 75% less power than pumps in ordinary use, and direct representations that a wealthy man stood ready and willing to pay $150,000 for 2500 shares of the stock. These cases are not like the instant case.

If, in view of the evidence that there was greater inaccuracy in the markings upon appellee's tank wagon compartments than is conceded by appellee in its replications, it be thought hard that the appellants must pay the whole of the note, less the conceded credits, it is to be borne in mind that the appellants chose to adopt a course of defense intended either to subject them to liability for the whole of the note, less the credits, or to relieve them from any liability whatever notwithstanding the fact that it is not disputed that the appellee performed its part of the bargain with the appellants themselves; that is to say, it is not disputed that the further credit which was the consideration for the appellants' signatures was extended to Motor Service. The appellants might have chosen an action in equity to reform the note for mutual mistake of fact in respect of the amount due from Motor Service, and thus have limited their liability to that amount. Ivinson v. Hutton, 1878, 98 U.S. 79, 25 L.Ed. 66; Barnett v. Kunkle, 8 Cir., 1919, 256 F. 644, dismissed for want of jurisdiction Harjo v. Kunkle, 1921, 254 U.S. 620, 41 S.Ct. 319, 65 L.Ed. 442.

Affirmed.