## NEW YORK TITLE & MORTGAGE CO. v. HUTTON.
### No. 6029.

Court of Appeals of the District of Columbia.

Argued March 12, 1934.

Decided June 4, 1934.

Rehearing Denied June 25, 1934.

HITZ, Associate Justice, dissenting.

———◆———

George P. Hoover and James C. Rogers, both of Washington, D. C., for appellant.

Levi H. David and E. Hilton Jackson, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

Appellee sued Capitol Title & Guarantee Company, Inc., and New York Title & Mortgage Company, the latter a New York corporation, to recover the sum of $2,500 alleged to have been paid by her to Capitol Company in the purchase by her of 20 shares of preferred and 10 shares of common stock of that company. She said she purchased the shares of stock in reliance upon representations made to her by the Capitol Company and the New York Company, and that the representations were false, fraudulent, and deceitful. She averred that the representations were made by the Capitol Company and the New York Company acting in concert and in furtherance of a common purpose and design to deceive and defraud.

The declaration was in two counts. The first alleged that the representations were made falsely, fraudulently, deceitfully, and knowingly; the second, that the representations were made falsely, fraudulently, negligently, recklessly, and deceitfully. The evidence shows that the New York Company was at the time engaged in the title insurance business, and that it was anxious to make a business connection with a title-searching company in the city of Washington. In the spring of 1928 Earnest, who was the president, and Weinstein, who was the principal organizer of the Capitol Company and who had superintended the construction of its title plant, went to New York to see McNeal, vice president of the New York Company. They stated to McNeal that the object of their visit was to see if they could interest the New York Company in a contract for reinsuring titles of property located in Washington. They said they had compiled a title plant for the District of Columbia and had the plant completed back to the year 1900. They told McNeal that the plant was in Baltimore, and that it had been assembled there to avoid publicity and possi-

990

ble opposition on the part of title companies doing business in the District of Columbia. They informed him the Capitol Company had on hand cash in the amount of $400,000. There was a good deal of other conversation between McNeal and the representatives of the Capitol Company, all intended to impress McNeal with the desirability of a business connection. As the result of this, McNeal agreed to send representatives of the New York Company to Baltimore to look over the plant, and he did send Weaver, one of his assistants, and George S. Parsons, solicitor of the New York Company. Weaver and Parsons went to Baltimore, saw the plant, and reported to McNeal that it was an up-to-date plant, and that the standing of the people identified with it was entirely satisfactory. This in turn resulted in the making of an agency contract between the New York Company and the Capitol Company. About two weeks after the contract was entered into, Earnest in Washington called Parsons in New York on the telephone, and, after discussing some purely formal matters in connection with methods of doing business, said to Parsons, "By the way, you have been down here and seen that plant, and you have told me that you thought it was a very good one. We have a lot of people around Washington here that are not friendly to us, and they are saying we haven't the proper tools to work with, and I would like for you to * * * write me a letter, expressing your opinion of that plant, as you told it to me." Parsons replied he was about to leave on his vacation and suggested that Earnest prepare the sort of letter he had in mind and send it up to him, saying if it was all right he would sign it. A little later Parsons received the proposed letter from Earnest. As originally drawn by Earnest, the letter contained a statement as to the monetary value of the plant of the Capitol Company and also some language reflecting on other Washington companies. Parsons struck out these portions of the letter proposed for his signature, rewrote it, signed it, and sent it to Earnest. The letter was as follows:

"New York Title & Mortgage Company,

"National Title Insurance Department,

* * * * * * *

"135 Broadway, New York, June 21, 1928.

* * * * * * *

"Dear Mr. Earnest: It is a source of great satisfaction to us to contemplate the arrangements recently completed by the officials of our company with the Capitol Title and Guarantee Company, Inc. The affiliation

of our companies is the consummation on our part of a desire to establish permanent relations with an organization in Washington that can and will give the residents of the Capital of the United States reliable and rapid title service, and to place the resources of this company at the disposal of Washington residents and business men.

"You can personally assure the business men and others interested in your project that the New York Title and Mortgage Company, with its capital funds of over $44,000,-000, stands ready at all times to substantiate our contract to indemnify and guarantee the titles to real property in Washington, D. C., Montgomery and Prince Georges Counties, Maryland, and Arlington and Fairfax Counties, Virginia, when passed and approved by your company. We say this because our experts have examined your plant thoroughly and have pronounced it to be one of the finest title plants in existence; that it is unparalleled in its mechanical aspects, including every modern feature for accurate and expeditious title service. It gives me personal pleasure to add my commendation to their voice and to say that you have one of the most remarkable title systems that it has been my lot to investigate. The plant itself, in my opinion, is worth a very high figure as it stands today and I know it will be a distinct benefit to the city of Washington to be able to get the type of service your company will afford it.

"I am confident that when the people of Washington realize the character of service you are able to render, and its obvious advantages to them, they will avail themselves of it."

In March, 1929, appellee went to a Washington bank and asked the cashier to purchase for her through the bank certain New York Stock Exchange stocks. The bank officer discouraged her investment in listed stocks, produced a circular of the Capitol Company, showed it to her, and in effect said that the stock of this company was a better investment. She took the circular with her and returned to her home, and a little while later O'Hare came to her house and introduced himself to her as a stock salesman for the Capitol Company, saying he had been sent by the officer whom she had talked to at the bank. During the conversation he gave her, and afterwards left with her, two or three circulars of the Capitol Company, in one of which the letter from Parsons was printed in full. Appellee examined the circulars and thought the matter over, and subsequently went with

O'Hare to the Capitol Company's office, where she talked with the president and remarked that O'Hare had about convinced her that an investment in the Capitol Company's stock would be a good one. Two or three days after this visit she made the stock purchase, paying $2,500 in cash.

The case was tried below to a jury and resulted in a verdict for the plaintiff (appellee) against both Capitol Company and New York Company. This appeal is taken by the New York Company alone from the judgment entered on the verdict of the jury.

The assignments of error are numerous, but, in the view we take of the case, we need consider only one. At the conclusion of plaintiff's evidence, and again at the conclusion of all the evidence, the New York Company moved for a binding instruction, which was refused. In our opinion the court should have taken the case from the jury as to the defendant New York Company. The representations made by the New York Company on which it is claimed appellee relied are all contained in the Parsons letter which we have set out in full. These were that the Capitol Company's plant was one of the finest title plants in existence, unparalleled in its mechanical set up, and including every modern feature for accurate and expeditious title service, and that it was one of the most remarkable ever investigated by the New York Company's solicitor and counsel and was worth a very high figure; that its opinion in this respect was the result of an examination by its experts, and that it had accordingly established permanent relations with the Capitol Company and had placed its resources consisting of a capital fund of over $44,000,000 at the disposal of Washington residents and business men in the prosecution of the title business of the Capitol Company, and that it could personally assure business men and others interested in the project of the Capitol Company that the New York Company stood ready at all times to guarantee the titles to real property in Washington and adjacent counties which had been passed on, and approved by, the Capitol Company.

Appellee's case below was that she had purchased stock in the Capitol Company upon the basis of the statements made in the Parsons letter, that these statements were material and were false to the knowledge of the New York Company, or were recklessly made, and that they were issued for the purpose of selling the stock of the Capitol Company, and that appellee relied upon the statements as a procuring cause of purchase, and thereby suffered loss.

Appellant's position both here and below is that, without regard to the question of the accuracy or inaccuracy of the statements in the letter with relation to the character of the title plant, none of the statements made in the Parsons letter was made with the intent that it should be used for the purpose of inducing anybody to buy stock in the Capitol Company. Counsel for all parties apparently agree that, in order to establish the charges of the declaration, the plaintiff must show that the representations made by the defendant were material; that they were false; that they were not actually believed by defendant, on reasonable grounds, to be true; that the representations were made with the intent that they should be acted on by the plaintiff; that they were acted on by her to her damage; and that in doing so she was ignorant of the falsity and reasonably believed the statements to be true. See Southern Development Co. v. Silva, 125 U. S. 247, 250, 8 S. Ct. 881, 31 L. Ed. 678.

In this case there was sufficient evidence to submit to the jury the question whether the representation made as to the character of the title plant of the Capitol Company was so exaggerated as to be either reckless or untrue, for the evidence clearly shows it was at the time an incomplete plant, and that a great deal of labor and time would be required to bring it within the fulsome description of the letter. If, therefore, the representation was reckless and was made with intent that it should be acted on by appellee, and if the representation was one which Parsons, as solicitor of the company, was authorized to make so as to bind the company—a question as to which we express a serious doubt but do not decide—the conclusion might properly follow that it was material and was either the inducement, or one of the inducements, leading to the purchase of the stock and the loss of the money.

In this view, the question which should have controlled the lower court in granting or refusing a binding instruction was whether the injury to appellee could have been reasonably anticipated as the probable consequence of the misstatements contained in the letter. Stated otherwise, the question here is whether the statements made in the Parsons letter were made for the purpose of inducing her, or the public generally, to purchase shares of stock in the Capitol Company, or whether they were made for an altogether different

purpose and without reason to believe they would be used to influence persons to become holders of the shares of the Capitol Company. The controlling rule in such cases is that stated by Judge Sanborn in Western Union Tel. Co. v. Schriver (C. C. A.) 141 F. 538, 542, 4 L. R. A. (N. S.) 678:

"One who makes a representation owes no duty of care to tell the truth to those to whom he does not communicate it and to whom he does not anticipate that it will be conveyed, and a person of ordinary prudence and intelligence in his situation would not anticipate that it would be conveyed, and such parties have no cause of action against him for injuries they sustain by reason of the falsity of the representation. 'Courts will give appropriate redress or relief for actionable misrepresentation to anyone to whom the same was made or for whom it was intended, and only to such.' [Citing cases.] The reason is that the loss to him to whom the party who makes the misrepresentation does not communicate it, and cannot reasonably anticipate that it will be communicated, is not the natural or probable consequence of his act. It is the effect of an independent cause—of the unexpected conveyance of the misrepresentation to the third party by the person to whom it was originally made. Without this new cause, the injury to the third person would not occur and the intervention of this new agency, as Wharton felicitously expresses it, 'insulates' the original act of negligence from the injury. [Citing cases.]"

With this rule in mind, we must have recourse to the evidence to determine whether in writing the letter Parsons, as the representative of the New York Company, intended, or had reasonable cause to believe, that it should be used for the purpose of inducing anybody to buy stock in the Capitol Company. We find nothing in the original conference between the officers of the Capitol Company and the vice president of the New York Company which would indicate that the agency contract which the Capitol Company sought to make with the New York Company had any relation to the building up of the Capitol Company's financial structure. On the contrary, the evidence is that at that time the vice president of the New York Company was told that the Capitol Company had been organized with a capital of $650,000 and had in hand at that time $400,000 of cash. The evidence of the vice president of the New York Company is that in subsequent conferences with the representatives of the Capitol Company no mention of any sort was made of a purpose to engage in a stock-selling campaign or to sell stock at all. It is true that about the time appellee bought her stock appellant's vice president was elected a director of the Capitol Company, and that some three weeks later he came to Washington to attend the meeting of the directors. At this meeting he learned for the first time the Capitol Company was engaged in stock sales, and that the letter of his company was a part of its advertising matter. He testifies he immediately rebuked this unauthorized use of the letter, but apparently no formal action was taken to cause its withdrawal from circulation. The weakness of this is, however, that it all occurred long after appellee had bought her stock, and neither action nor nonaction at that time would have affected the result. The evidence of Parsons, the writer of the letter, is clear that he understood the application to him to write the letter to be grounded on a desire on the part of the Capitol Company to use it in connection with a campaign to get title business for that company. He stated that he had in mind at all times the fact that he was giving the letter in furtherance of a duty on the part of the New York Company, as principal under the agency contract, to help the Capitol Company get business for the benefit of both parties to the contract, and that this was all that he had in mind; that the idea that the letter would be used in the sale of stock was not mentioned, nor was it considered or thought of by him. There is no contradiction of this evidence, but there is much corroboration of it, and indeed no suggestion from anybody that at the time the letter was written the sale of stock was thought of, except by one of the promoters of the Capitol Company, Weinstein, who was himself the holder of a large amount of stock which apparently he was anxious to sell. The witness Earnest, who prepared the letter and sent it to New York for Parsons' signature, stated that the only purpose he knew of in connection with the letter was the securing of title business. The letter itself bears testimony to the truth of this evidence. It obviously was written to secure clients rather than to stimulate sales of stock.

On the part of appellee, it is claimed that the use in the covering letter, which Parsons wrote at the same time, of the expression, "I have been pleased to sign [the letter] for use in connection with your publicity campaign," shows knowledge of a purpose to use the letter to promote sales of stock, but this contention is without force. Reference is also made to the language of the letter sent by the presi-

dent of the Capitol Company to Parsons inclosing the form of letter he desired to have signed: "This will, of course, be used in connection with our advertising and publicity in Washington, D. C., and its suburbs." But we can see no connection between the language used and the sale of shares of stock. In fact, it seems to us that the letter from Earnest to Parsons clearly defines the purpose of its solicitation, for to say, as was said, that it was to be used for "advertising and publicity" in Washington and suburbs, especially when considered in connection with the fact that the company was just then inaugurating its campaign to get business, clearly indicates that it was a business-getting rather than a stock-selling letter, and from that point of view the letter, notwithstanding it was an exaggerated statement of the then facilities of the Capitol Company, was otherwise unexceptionable. The court below stated to the jury that the plant system was a good one, and the great weight of the evidence supports this. The difficulty was that it had not been availed of to carry back the records far enough to be effective; in other words, considerable individual research was necessary in every case in the preparation of an accurate abstract of title. In this aspect it was misleading to describe it in the language Parsons used, but, as used, it was little more than what is generally called trade talk. The statement with relation to the association of the New York Company with the Capitol Company was wholly true. The contract between these two companies assured to any client of the Capitol Company a title guaranteed by the New York Company, and the evidence shows that the New York Company consistently lived up to its contract. In view of what we have just said, it inevitably follows that there was no evidence to justify the lower court in submitting to the jury the question whether the New York Company, in writing the letter and in making the representations therein made, anticipated, or had any reason to anticipate, that the letter or its representations would be used to induce persons to buy stock from the Capitol Company.

If neither the president nor the solicitor of the New York Company knew that the Capitol Company was selling stock, and if on the contrary they believed that its capital structure was complete, and that its only interest in having the letter was to stimulate business, and the letter itself speaks clearly to that end, plaintiff has failed to prove her case. In saying this, we do not overlook the ordinary rule that a person who does an act

is supposed to contemplate what naturally results therefrom, but a necessary element of the rule is that the party doing the act must have reasonable cause to believe it will cause, or tend to cause, the consequences complained of. Here, as we have found, ground for such reasonable belief is wholly lacking. There is positively no evidence in the case of any collusion or conspiracy between the two companies. Their interest was identical only in the matter of obtaining business. The New York Company had no advantage or profit of any kind in the sale of the Capitol Company's stock. It believed that in making the agency agreement it was dealing with a company whose capital was fully subscribed and whose surplus was nearly $500,000. In the reinsurance of its title abstracts it had a material interest, because it shared in the fees collected, and it was in pursuit of this interest alone that it wrote the letter. There was no privity between any of its officers and appellee and no evidence that any of its officers ever made any representation directly to appellee. There is no evidence to show that prior to the time appellee purchased the stock the New York Company knew that the letter had been copied into the circulars introduced in evidence, though, of course, it is fair to assume that it intended the letter to be used for the purpose of circularizing those interested in securing abstracts of title and having them guaranteed. While it is not necessary in a case of this kind to allege or prove that the shares of stock were sold directly by the person charged with the false representation, it is nevertheless important to show a relation of interest between the one deceived and the one charged with having made the false representation.

In this case the New York Company did not participate in the sale of stock directly or indirectly, and the representations complained of were not made by it to induce the purchase of shares of stock of the Capitol Company by appellee or any one else. The real point involved in this discussion is the inquiry, Whom did the New York Company intend to influence in writing the letter for publication? If the representations were made only to stimulate title business, there can be no recovery, for, so far as we know, it has never been held that it is a proper ground of action that the defendant made a dishonest representation and that the plaintiff relied upon it and sustained injury, unless the misrepresentation was intended, or by its very nature was calculated, to induce the very action by a party which resulted in his dam-

age. Cooley on Torts, p. 493; Hindman v. First Nat. Bank (C. C. A.) 112 F. 931, 942, 57 L. R. A. 108.

We think the letter in this case clearly shows that it was written for the exclusive purpose of accelerating the business in which both companies were interested and for no other purpose. In view of the fact this case must be retried, and likewise of the fact that the evidence in the new trial may be materially different from that in the first, we think it proper to say that in our opinion the lower court was in error in refusing to permit the witness Parsons to testify as to his belief in the truth of all the statements contained in the letter of June 21, 1928. The action here was deceit, and on such an issue misrepresentations believed to be true, though the result of ignorance or negligence, will not sustain the action. No doubt a false statement recklessly made without knowledge of its truth or falsity is actual fraud, but in that case there must be knowledge of the falsity, or reckless disregard of the truth, to justify saying the misrepresentation was fraudulent. If the same question should arise on the new trial, the witness Parsons should be permitted to testify as to his belief in the truth of the statements of the letter, and the court should then submit to the jury the question whether the statements made in the letter were made with such recklessness and heedlessness of consequences as to amount to fraud.

It follows the action of the lower court in refusing to direct a verdict for the New York Company was wrong, and the judgment therefore should be and is reversed, and the cause remanded for a new trial to be had in accordance with this opinion.

Reversed and remanded.

HITZ, Associate Justice (dissenting).

I am unable to agree with the judgment and opinion of the court in this case, and I leave aside any question as to whether the representations here made were ultra vires of the New York Company or beyond the authority of its officers who made them, since no such question is presented by the record.

This court reverses the judgment for error in overruling the motion of the New York Company for a directed verdict upon the whole evidence and sending the case to the jury.

The representation in question states, with the weight of an important source, that the plant of the Capitol Company is "one of the finest title plants in existence; that it is unparalleled in its mechanical aspects, including every modern feature for expeditious title service; * * *" that "the plant itself, in my opinion, is worth a very high figure as it stands today, and I know it will be a distinct benefit to the city of Washington to be able to get the type of service your company will afford it," and "we say this because our experts have examined your plant thoroughly."

But in fact the plant was a mere skeleton and got nowhere, consisting of conveniently arranged take-off slips from the land records in Washington, covering, more or less completely, the conveyances of a few years, variously stated in the record as going back to 1910 or 1912 or 1900, but not pretending to reach any source of title.

The thorough examination by experts consisted of a short visit to the plant in Baltimore by two men from New York, neither of whom had ever examined a title in the District of Columbia.

These men reached Baltimore at lunchtime, there had luncheon with the Baltimore agent of the New York Company, made a short visit to the plant in the strenuous season immediately following luncheon, and returned to New York on the same afternoon.

This visit lasted from one to two hours, at least half of which was devoted to listening to Mr. Weinstein, who had put the plant together and who was trying to sell it to the Capitol Company, then in course of organization but not in business, and whom the examiners speak of as their chief source of information about the plant.

On their return to New York the experts made a highly favorable report to their superior officers, and shortly thereafter, when the Capitol Company asked for a written repetition of their oral enthusiasm, the statement in question was written and transmitted by the chief law officer of the New York Company.

As shown by the covering letters, this statement was asked, written, and delivered for the sole and expressed purpose of a publicity campaign then contemplated and immediately begun by the Capitol Company in Washington.

My examination of the record leaves me no doubt that the plant was a fake; the inspection was a farce; and the statement touching both was false within the knowledge of the man who made it, who was one of the so-called "experts" making the so-called "examination."

This statement, being made for purposes of publicity in a matter of business, was made

to any person who received it; an agent of the recipient brought it to the attention of the plaintiff as a member of the public; and she acted in reliance thereon to her injury.

The falsity of the statement is recognized by the opinion, as well as by the man who made it, for, while he says in his representation that the plant was thoroughly examined in the two-hour visit which he does not mention, in his testimony he says that a thorough examination of the plant would require several weeks if not months.

But this is not all, for this managing vice president, after consultation with his senior officers, and again at the request of the Capitol Company, became a director of the Capitol Company on March 5, 1929, and remained a director until February 5, 1930.

The stock was sold to the plaintiff on March 21, 1929, being certain preferred and common shares, which were exchanged by the company for all common shares in June 1929, so that he was a director when the stock was sold to the plaintiff, and throughout the period here in question.

The Capitol Company was then in embryo, opening for business some months later, and during this period the vice president of the New York Company made repeated visits to Washington personally soliciting business for the Capitol Company and otherwise taking part in its affairs and consulting with its officers both here and in New York.

The plaintiff testified that the salesman offering her the stock read to her the letter complained of and another circular showing the vice president of the New York Company as a director of the Capitol Company; and that she was thereby influenced and in part induced to make the investment.

The vice president testified at such length that the condensed and narrative statement of his evidence occupies 32 pages of the printed record, and the contradictory statements in his evidence alone not only justified, but required, the submission of the case to the jury.

For he testified that, while he had previously heard of stock sales and contentions thereabout, at the first directors' meeting which he attended, which was on May 3d, he opposed and protested against sales of stock.

But, when the minute book of that meeting was produced to him, it showed that he made a motion to continue the sales of stock at the peculiar unit price paid for it by the plaintiff, one half of the proceeds of such sales to go to Mr. Weinstein in payment of stock issued to him and the other half to the Capitol Company.

This motion was lost, but another motion to continue stock sales without requiring any proceeds to go to Mr. Weinstein was carried at the same meeting.

He further testified that, while he orally rebuked the chief stock salesman for sundry allurements he had made connecting the New York Company not only with the sale of the stock, but with the possible purchase thereof at a higher price, he saw "no reason to undertake to arouse the public against the Capitol Company," and neither he nor his company ever repudiated the representation which it had made, or withdrew it from its known use for stock-selling purposes, or took any steps toward advising the public of what they now contend was its restricted meaning and purpose; namely, to aid in selling to the public the Capitol Company's certificates of title but not its certificates of stock.

And it is upon this distinction that the court now rests its judgment and opinion.

But the statement, in its setting, and with its implications, was capable of advantageous use for both purposes, and was extensively used for both purposes within the knowledge or notice of the New York Company.

"It is the duty of directors to know the condition of the corporation whose affairs they voluntarily assume to control, and they are presumed to know that which it is their duty to know, and which they have the means of knowing." Seale v. Baker, 70 Tex. 290, 7 S. W. 742, 744, 8 Am. St. Rep. 592; Tate v. Bates, 118 N. C. 308, 24 S. E. 482, 54 Am. St. Rep. 719; Watson v. Jones, 41 Fla. 241, 25 So. 678, 682; Ward v. Trimble, 103 Ky. 153, 44 S. W. 450, 452.

So that it is hardly accurate to say—as the opinion does say—that the plaintiff's case rests entirely upon the false statement, since it rests upon that statement plus the knowledge of the use that was being made of it, which is a very different thing.

One count of the declaration charges that the false statement was made knowingly; the other that it was made recklessly and negligently, but it was equally false in either aspect, and a statement untrue in fact, though made in negligence and not in fraud, if relied upon to injury, may render the maker liable for resulting loss. International Products Co. v. Erie Railroad Co., 244 N. Y. 331, 155 N. E. 662, 56 A. L. R. 1377.

The opinion of this court states the con-

trolling rule in such cases to be that one who makes a representation owes no duty of care to tell the truth to those to whom he does not communicate it, or to whom he does not expect its communication, and quotes with approval from Wharton that the communication of a false statement to a third person so insulates the original negligence from the injury as to destroy the cause of action.

But when Wharton wrote we had not yet achieved publicity campaigns, with interlocking directorates, and brazen stock salesmen invading a woman's house by secret information from her banker that she had saved a few dollars which might be enticed away from her.

And privity of contract between the maker of a false statement and one deceived thereby is not always essential to liability, for, where such representations are made for the purpose of influencing the mind of the public, whoever in fact receives, relies, and acts upon such representation to his injury may regard them as made to him, and have his remedy against the maker. National Bank v. Oil Mill (C. C. A.) 202 F. 90; Davis v. Trust Co. (C. C. A.) 181 F. 10, 30 L. R. A. (N. S.) 1011; Carvill v. Jacks, 43 Ark. 454; Staver & Abbott Mfg. Co. v. Coe, 49 Ill. App. 426; Courtney v. William Knabe & Co. Mfg. Co., 97 Md. 499, 55 A. 614, 99 Am. St. Rep. 456; 2 Cooley on Torts, § 358.

And it is sufficient if the false statement was one of the inducements to invest the money in question; it need not be the sole inducement. Morgan v. Skiddy, 62 N. Y. 319.

I find no rule controlling this case in Western Union Telegraph Co. v. Schriver, relied on by the court, but rather in Glanzer v. Shepard, 233 N. Y. 236, 135 N. E. 275, 276, 23 A. L. R. 1425, where the court says that:

"Constantly the bounds of duty are enlarged by knowledge of a prospective use. * * * We must view the act in its setting, which will include the implications and the promptings of usage and fair dealing. The casual response, made in mere friendliness or courtesy * * * may not stand on the same plane, when we come to consider who is to assume the risk of negligence or error, as the deliberate certificate, indisputably an 'act in the law.' * * * The line of separation between these diverse liabilities is difficult to draw. It does not lose for that reason its correspondence with realities. Life has relations not capable always of division into inflexible compartments. The molds expand and shrink. We state the defendants' obligation, therefore, in terms, not of contract merely, but of duty. Other forms of statement are possible. They involve, at most, a change of emphasis."

Negligence is a modern and living subject in the law, whose scope is everwidening with the changes of modern life.

Society is constantly becoming more complex and less scrupulous, while the consequences of negligence are more far-reaching and less obvious.

As the resulting obligation to use care becomes more strict in morals, it must become more strict in law, or the courts must fall short of their duty.

And it is clear that the trend of modern decisions is toward the enforcement of a general duty to be careful, as well as a general duty to abstain from willful harm, both in statement and in act.

If the maker of this statement had negligently scratched the plaintiff's arm with his pen, he or his company would have been liable for the resulting damage, and, if his negligence in the use and custody of what he writes with the same pen results in equal or greater damage, he or his company should be similarly liable, for "there can be no controlling difference between damage to the person and damage to the purse."

A man occupying an influential position in modern business by his false statements may affect the welfare of many persons whom he never sees or who never hear his voice, and he should be held at least to as high a measure of responsibility for his reckless pen as for his negligent motorcar.

For his pen may impoverish thousands, while his car can hurt but few.

In my opinion, the contradictory statements of the vice presidential director and the chief law officer when testifying as witnesses for the defendant required this case to be sent to the jury under the established practice of the court, and consequently the ruling that sent it there was not error, and the judgment should be affirmed and not reversed.

The following authorities are thought to support the views and statements of this opinion. Harriott v. Plimpton, 166 Mass. 585, 44 N. E. 992; Edwards v. Lamb, 69 N. H. 599, 45 A. 480, 50 L. R. A. 160; Houston v. Thornton, 122 N. C. 365, 29 S. E. 827, 65 Am. St. Rep. 699; Laudie v. Telegraph Co., 126 N. C. 431, 35 S. E. 810, 78 Am. St. Rep. 668; 3 Cooley on Torts, § 497; 5 Law Quarterly Review 103; 7 Law Quarterly Review 107; 16 Harvard Law Review 184.