Marianne T. CAULFIELD,
et al., Appellants,

v.

Howard A. STARK, M.D.,
et al., Appellees.

No. 04–CV–548.

District of Columbia Court of Appeals.

Argued Dec. 1, 2005.

Decided March 9, 2006.

Larry D. McAfee, Chantilly, VA, with whom James P. Gleason, Jr., was on the brief, for appellants.

Alfred F. Belcuore for appellees.

Before FARRELL and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

On appeal of this medical malpractice case, the appellants, Marianne Caulfield and her husband, Robert (claiming loss of consortium), contend that the trial court erred when it granted judgment as a matter of law (JMOL) to appellees, Howard A. Stark and his medical group, on the Caulfields' claims of fraudulent misrepresentation, unlawful trade practice, and punitive damages. In addition, the Caulfields assert that the trial court erred in two evidentiary rulings: admitting Dr. Stark's writing sample; and failing to permit Dr. Stark's impeachment with a learned treatise while he was testifying as an adverse witness. We find no error and affirm.

## I.

## STATEMENT OF THE CASE

On March 15, 1995, Ms. Caulfield telephoned Dr. Stark, a gastroenterologist, to schedule an appointment to discuss colonoscopy procedures.[1] Dr. Stark suggested that Ms. Caulfield come into the office because she reported to him that she had noticed "a bit of blood in [her] stool." Ms. Caulfield did not immediately make an appointment with Dr. Stark but waited until after her law school studies and examinations were completed. Ms. Caulfield met with Dr. Stark on May 17, 1995 and described various symptoms that are associated with colon cancer. Dr. Stark did not perform a physical examination of Ms. Caulfield at that time but said he would check with her insurance carrier to obtain approval for scheduling a colonoscopy.

After leaving the office, Ms. Caulfield believed that either she was to call the Medical Group's offices to follow-up on the insurance carrier's approval and the scheduling of the colonoscopy, or someone from the Medical Group's administrative staff would phone her. According to her testimony, Ms. Caulfield phoned the Medical Group's office within a week and learned that insurance carrier approval had not been obtained. She called two weeks later and was told again that the procedure had not been approved by the insurance carrier.[2] Ms. Caulfield also testified that she

1. Ms. Caulfield was referred to Dr. Stark by her primary care physician, Christopher McMackin, M.D. Drs. McMackin and Stark are colleagues and members of a professional corporation, McMackin, Stark & Zimnoch, P.C. (the Medical Group), an appellee in this matter. Ms. Caulfield selected the Medical Group from a listing of her medical insurance carrier's preferred providers. She sought treatment from Dr. McMackin on March 10, 1995 for symptoms of a severe sinus infection. During this appointment, Ms. Caulfield revealed to Dr. McMackin that her mother had died from colon cancer at approximately age forty-six. After telling Dr. McMackin that she wanted "to get screen[ed] with a colonoscopy," he referred her to his partner, Dr. Stark.

2. The parties do not agree as to why this procedure was not performed during the spring/summer of 1995. Ms. Belle, the Medical Group's office manager, testified that she checked Ms. Caulfield in for her appointment with Dr. Stark on May 17, 1995. Ms. Belle further testified that she next had contact with Ms. Caulfield around May 24, 1995 to inform her of her insurance benefits related to the proposed colonoscopy. Although, Ms. Belle did not testify as to what she specifically told Ms. Caulfield, Ms. Belle did testify that the insurance carrier representative had told her that no preauthorization was required for a colonoscopy procedure and that the Washington Hospital Center, where the procedure would be performed, was not an "in-network hospital" with Ms. Caulfield's insurance. As a result, the insurance carrier would offer more limited coverage for the services provided by the Washington Hospital Center: Ms. Caulfield would first have to meet a $400 deductible and the insurance carrier would pay seventy percent of the remaining bill. The insurance carrier, however, would pay 100% of the charges for her medical expenses once Ms. Caulfield had paid $1200 out-of-pocket. Ms. Belle then testified that she next spoke with Ms. Caulfield on August 23, 1995

believed that Dr. Stark had diagnosed her with irritable bowel syndrome, and that because the insurance carrier had not approved the colonoscopy, it was not warranted. Ms. Caulfield never consulted Dr. Stark again. She continued to be treated by Dr. McMackin as her primary care physician, but, according to her testimony, they never discussed the need for a colonoscopy.

In February 1998, after watching a television program about colon cancer, Ms. Caulfield scheduled an appointment with another gastroenterologist, Dr. Alan Blosser. He provided Ms. Caulfield with printed information about the dangers of colon cancer in a patient who has had family members die at an early age from that disease.[3] He performed a colonoscopy on Ms. Caulfield in April and discovered a mass in her rectum and two smaller polyps in her colon. After consulting with other specialists about her treatment options, Ms. Caulfield had surgery at Mt. Sinai Hospital in New York on June 26, 1998 to remove a large portion of her rectum. Between December 1998 and November 1999, Ms. Caulfield underwent three additional reconstructive surgeries to repair incisional hernias. As a result of all of these surgeries, Ms. Caulfield claims that she has suffered extreme pain, permanent damage to her abdomen and intestinal tract, severe and embarrassing post-operative side effects, and depression, and that she cannot safely carry a pregnancy to term because of mesh inserted in her abdominal cavity to repair the hernias.

In January 2004, a jury trial was held before the Honorable Anna Blackburne–Rigsby. At the close of the Caulfields' case, Dr. Stark and the Medical Group moved for JMOL on the Caulfields' claims of fraudulent misrepresentation, unlawful trade practices, and punitive damages. After hearing oral arguments, Judge Blackburne–Rigsby granted Dr. Stark and the Medical Group JMOL on these claims. The case was submitted to the jury only on the negligence claim. The jury found that the Medical Group had breached the standard of care but that its breach of care was not a proximate cause of the Caulfields' injuries. This timely appeal followed after the trial judge denied appellant's motion for a new trial.

## II.

## CLAIMS GRANTED ON JMOL

### A. *Standard of Review.*

"[J]udgment as a matter of law is proper only when the material facts are undisputed and when reasonable jurors could reach only one possible conclusion

---

regarding referral to a dermatologist or a plastic surgeon for an unrelated medical condition. Ms. Caulfield told Ms. Belle that "she would call back when she was ready to schedule the procedure, the colonoscopy."

3. In addition to Drs. McMackin and Stark, Ms. Caulfield was advised by virtually all of her treating physicians from 1991 to 1997 to obtain a colonoscopy based on her family history of colon cancer. In 1994, Ms. Caulfield did not obtain a colonoscopy because, after submitting to a medical test to detect blood in the stool and hearing nothing further from the internist who performed the test, she believed that she did not need to undergo more invasive testing. Again, in 1997, Ms. Caulfield did not follow-up on her doctor's referral for a colonoscopy because she felt that she "was absolutely powerless" to schedule a colonoscopy, since "[e]verything was managed through the primary care physician." Ms. Caulfield also testified that she understood how her insurance coverage worked and that she could call the carrier to question denials of coverage and reimbursement. Her husband, Robert, testified that "money was not an issue at all and never factored into any of our medical decisions that we have ever made."

based on those facts." *Bushong v. Park,* 837 A.2d 49, 53 (D.C.2003). "[T]he record must be viewed in the light most favorable to the non-moving party, and that party ... is entitled to the benefit of every reasonable inference from the evidence." *Washington Metro. Transit Auth. v. Jeanty,* 718 A.2d 172, 174 (D.C.1998). Accordingly, we review the trial judge's order *de novo.*

### B. *Fraudulent Misrepresentation.*

The Caulfields claim that Dr. Stark and the Medical Group engaged in fraudulent misrepresentation by: (1) telling Ms. Caulfield that they had taken steps to receive authorization from her insurance carrier; (2) billing her insurance carrier under a medical authorization code that did not reflect the actual level of services provided; and (3) submitting a diagnosis on Ms. Caulfield's bill for medical services that was unjustified based on the symptoms that she had described to Dr. Stark. According to the law that governs here:

> Fraud is never presumed and must be particularly pleaded. It must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit. The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge

of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.

*Virginia Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226, 1233 (D.C.2005) (internal quotations and citations omitted).

#### 1. *Authorization from Insurance Carrier.*

The Caulfields contend that Dr. Stark and the Medical Group misrepresented to Ms. Caulfield that her insurance carrier had denied approval for her colonoscopy. Although there is no clear and convincing evidence in the record to explain why the Medical Group did not obtain insurance carrier authorization for the colonoscopy, the insurance carrier records support Ms. Caulfield's position that there was no authorization on file. But why was there none? It is possible that the Medical Group's administrative staff was negligent in failing to follow the insurance carrier's authorization procedures, or that the staff did not follow through because Ms. Caulfield cancelled the procedure;[4] the record does not provide an answer. That said, however, there is no evidence in the record to support the Caulfields' contention that Dr. Stark or any representative of the Medical Group "made any false statement with an intent to deceive [Ms. Caulfield]."[5] "[M]isrepresentations be-

---

4. Ms. Caulfield believed that the insurance carrier had not authorized the procedure. She did not contact the insurance carrier herself, however, to determine why the procedure had been denied or to inquire what steps had to be taken to obtain the necessary approvals.

5. There is conflicting testimony in the record regarding what, if any, steps the administrative staff of the Medical Group took to obtain authorization from Ms. Caulfield's insurance carrier. Jeanette Drake, representing Ms. Caulfield's insurance carrier as their corporate designee, testified via videotape deposi-

tion that someone from Dr. Stark's office had phoned the insurance carrier's customer service representative on May 23, 1995. The customer service representative, she said, informed the caller that she needed an authorization from Ms. Caulfield's primary care physician for the colonoscopy before the insurance carrier could authorize that procedure. The insurance carrier's telephone logs also indicated that it had received a call from "doctor's office" on May 24, 1995 requesting out-of-network benefits for a colonoscopy, and the insurance carrier had provided a description of benefits consistent

lieved to be true, though the result of ignorance or negligence, will not sustain the action." *New York Title & Mortgage Co. v. Hutton,* 63 App.D.C. 266, 271, 71 F.2d 989, 994, *cert. denied,* 293 U.S. 605, 55 S.Ct. 122, 79 L.Ed. 696 (1934). At most, on this record, Ms. Belle's actions in failing to follow the insurance carrier's policies for authorization of medical procedures constituted negligence. No reasonable jury could have found otherwise.

### 2. *Billing Fraud.*

The trial court determined that a reasonable jury could not find by clear and convincing evidence that Dr. Stark's conduct constituted billing fraud by charging Ms. Caulfield's insurance carrier $70 for an office visit under Current Procedural Terminology ("CPT") Code 99213 and submitting a diagnosis of diarrhea. The Caulfields contend that in order for Dr. Stark to bill Ms. Caulfield under CPT Code 99213, he would have had to satisfy two of the three components listed in the American Medical Association's 1995 Evaluation and Management Services Guidelines (the Guidelines).[6] Dr. Stark testified that he had believed he was justified in using that particular CPT code because he had made a medical decision to perform a colonoscopy on Ms. Caulfield and he had spent approximately thirty minutes with her dis-

cussing that procedure. With regard to his diagnosis of diarrhea, Dr. Stark testified that Ms. Caulfield complained of alternating bowel movements, of which diarrhea was a symptom. Dr. Stark further testified that the space on the billing form was not large enough to accommodate multiple diagnoses and that he did not believe that submitting a diagnosis of diarrhea constituted billing fraud.

There is no additional evidence to substantiate that Dr. Stark's actions amounted to billing fraud. It is not disputed that Dr. Stark had a face-to-face consultation with Ms. Caulfield on May 17, 1995 for which he billed her $70. Dr. Stark also had a telephone conversation with Ms. Caulfield on March 17, 1995 of an unknown duration in which they discussed Ms. Caulfield's family history of colon cancer. He apparently did not submit an additional bill for this earlier service. The Caulfields did not demonstrate what the correct billing code for this level of service should have been or suggest that if a more appropriate billing code had been used the charge for the services would have been less than $70. Furthermore, there is no evidence that Dr. Stark was compelled to submit a diagnosis of diarrhea or otherwise be denied payment for his services. Thus, Dr. Stark's actions with respect to the billing form can be characterized, at most, as negligent

with Ms. Belle's earlier testimony. *Supra* note 2. Ms. Drake further testified that she had been unable to locate any information in the customer service, care coordination, or medical management records of the insurance carrier indicating that a colonoscopy procedure had been authorized for Ms. Caulfield in May 1995. Thus, it would appear from the testimony of both Ms. Drake and Ms. Belle that the administrative staff of the Medical Group did initiate a conversation with Ms. Caulfield's insurance carrier to obtain authorization for the colonoscopy. But, based on the insurance carrier's record, it would appear that the Medical Group staff never followed through to inform the insur-

ance carrier that Dr. McMackin, Ms. Caulfield's primary care physician, had approved the procedure. Ms. Drake testified that if the primary care physician had authorized the colonoscopy, the insurance carrier would have approved it.

6. These components include: "an expanded problem focused history; an expanded problem focused examination; [or] a medical decision making of low complexity." The description for CPT Code 99213 also states that "[p]hysicians typically spend 15 minutes face-to-face with the patient and/or family."

preparation or ignorance of how to properly complete a billing form in conformity with the Guidelines. *See New York Title, supra.*

In sum, the Caulfields cannot sustain their claims of fraudulent misrepresentation.

### C. *Unlawful Trade Practice.*

Appellants also claim that Dr. Stark and the Medical Group violated the District of Columbia Consumer Protection Procedures Act (CPPA).[7] In doing so, they essentially restate their claim of fraudulent misrepresentation as a claim under the statute. Specifically, in the language of their brief on appeal, they cite three alleged misrepresentations of "a material fact" by Dr. Stark and the Medical Group which, they say, had a "tendency to mislead," namely that: "(I) they had taken the requisite steps to obtain insurance authorization for Mrs. Caulfield's colonoscopy and that MetLife had denied authorization when in fact they had not; (ii) Appellee Stark had performed a 'CPT Code 99213' office visit when in fact he had not; and (iii) Mrs. Caulfield's diagnosis was diarrhea when there was no medical justification for this diagnosis."

■ Although this court has held that the CPPA applies to non-lawyers who purport to practice law, *Banks v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 634 A.2d 433, 437 (D.C.1993), we have not previously considered whether the CPPA applies to the medical profession. In *Banks,* we upheld an order of the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) that concluded Banks had engaged in deceptive trade practices, D.C.Code § 28–3904(a), (b), and (d), based on his unauthorized practice of law.[8] *Id.* at 440. Having ruled as we did in *Banks* with respect to legal services, we can discern no reason why the performance of medical services should not be a "trade practice" as well under the CPPA. *Id.* at 437.

Several years after *Banks,* in *Osbourne v. Capital City Mortgage Corp.,* 727 A.2d 322, 326 (D.C.1999), we held that "the clear and convincing evidence standard applies to claims of intentional misrepresentation under the CPPA," but we did not address whether the CPPA also embraces claims of *unintentional* misrepresentation. Thus, the Caulfields, who claim unintentional misrepresentation in a patient-physician context under the CPPA, raise an issue of first impression for this court. This issue has, however, been considered in a federal district court decision, *Dorn v. McTigue,* 121 F.Supp.2d 17, 19 (D.D.C.2000) (*Dorn I*), where Judge Urbina concluded that "an unintentional-misrepresentation claim

---

7. D.C.Code § 28–3901 *et seq.* (2001). The CPPA provides in part that a violation occurs, "whether or not any consumer is in fact misled, deceived or damaged thereby," should any person
 (e) misrepresent as to a material fact which has a tendency to mislead; (f) fail to state a material fact if such failure tends to mislead; ... (p) falsely state or represent that ... servicing ha[s] been made and receiving remuneration therefor when [it has] not been made; ... [or] (u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

*Id.* § 28–3904(e), (f), (p), (u) (2001).

8. We also concluded that the evidence did not support the agency's deceptive trade practice findings under D.C.Code § 28–3904(e), (q), and (u) because Banks never represented to his client that he had performed the requested services. *Banks,* 634 A.2d at 439. As a result, Banks was required to pay restitution in the amount of $800 representing repayment of a client's deposit for services that were never rendered, interest on that amount, court costs, and a fine totaling $750 for the three violations of the CPPA. *Id.* at 440.

would fall outside the scope of the CPPA as it applies to the medical field." That decision is not binding on this court, however. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). Thus, unintentional misrepresentation under the CPPA is still an open question.

■ Assuming for purposes of this case (without deciding) that unintentional misrepresentation claims are available under the CPPA, there is a major roadblock to recovery discussed in a later opinion in the Dorn litigation (limited after *Dorn I* to intentional misrepresentation). *See Dorn v. McTigue*, 157 F.Supp.2d 37 (D.D.C. 2001) (*Dorn II*). In *Dorn II*, Judge Urbina suggested (without deciding) that the

CPPA did not extend to tort claims for malpractice, that is, to claims challenging a physician's competence. *Id.* at 46. As of the time he wrote he was correct. Recently, we held that, before an amendment to the law in October 2000, a plaintiff could not pursue damages under the CPPA "for personal injury of a tortious nature." *Childs v. Purll*, 882 A.2d 227, 237 (D.C. 2005) (tenant precluded from bringing suit for personal injury under CPPA against landlord accused of misrepresentation about presence of lead-based paint in apartment).[9] Accordingly, if any of the Caulfields' claims is best characterized as a claim for personal injury, that claim is barred.

9. In 1995, when the Caulfields' cause of action arose, the pertinent subsection of the law provided:

> Any consumer who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia *within the jurisdiction of the [DCRA]* may bring an action in the Superior Court of the District of Columbia to recover or obtain any of the following:
>> (A) treble damages;
>> (B) reasonable attorneys' fees;
>> (C) punitive damages;
>> (D) any other relief which the court deems proper.

D.C.Code § 28–3905(k)(1) (1991) (emphasis added).

In *Childs*, we "construed the italicized language to mean that where the [CPPA] limits the jurisdiction of the [DCRA], the scope of the cause of action created by § 28–3905(k)(1) is similarly limited." 882 A.2d at 238 (internal quotations and citations omitted). Another provision of the CPPA, D.C.Code § 28–3903(c)(1), limited the jurisdiction of the DCRA so that it could not "order damages for personal injury of a tortious nature." Accordingly, no such action was sustainable under the CPPA.

In October 2000, the Council of the District of Columbia amended § 28–3905(k)(1) so that the DCRA's jurisdiction was not linked to the scope of private civil litigation. The amended statute provides:

> A person, whether acting for the interest of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia and may recover or obtain the following remedies:
>> (A) treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;
>> (B) reasonable attorney's fees;
>> (C) punitive damages;
>> (D) an injunction against the use of the unlawful trade practice;
>> (E) in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice, or
>> (F) any other relief which the court deems proper.

D.C.Code § 28–3905(k)(1) (2001).

The amendment was not retroactive. *Childs*, 882 A.2d at 238. Since 2000, therefore, there has been no CPPA provision barring actions under that statute for "damages for personal injury of a tortious nature." On the other hand, we cannot say, because this issue is not before us, whether removal of the DCRA reference from the statute in 2000 is enough, in itself, to allow actions for personal injury of a tortious nature under the statute as amended.

Ms. Caulfield apparently believed that she did not need a colonoscopy because of the first and third alleged misrepresentations: (1) the Medical Group had sought authorization for the colonoscopy from Ms. Caulfield's insurance carrier, which had failed to authorize it, coupled with (2) Dr. Stark's written diagnosis of diarrhea, without any further diagnosis, on a billing form. Her reliance on these two actions, however, constitutes "attacks on the actual performance of [a physician's] medical service, which would be more appropriately addressed in the context of a[ ] medical malpractice claim." *Nelson v. Ho*, 222 Mich.App. 74, 564 N.W.2d 482, 487 (1997) (holding that physician's failure to inform patient of inherent risks involved prior to performing nasal surgery and representation that he would use nondissolvable sutures in her nose was not conduct in violation of Michigan Consumer Protection Act). The Caulfields' first and third claimed misrepresentations, therefore, are barred by this court's decision in *Childs*, because they accrued in 1995, five years before the CPPA was amended to allow the recovery of damages for personal injury claims sounding in tort. See *supra* note 9.

■ The second alleged misrepresentation, however, cannot be disposed of under *Childs*, because, unlike the other two, it cannot be characterized as a physician's performance of a medical service. Rather, it is more properly described as a misrepresentation used to generate a fee. A misrepresentation for that purpose would appear to fit naturally within one or more of the four CPPA provisions on which the Caulfields rely. See *supra* note 7. As elaborated earlier, Dr. Stark tendered a bill in the amount of $70 to Ms. Caulfield

for a medical consultation which no one disputes took place. The Caulfields contend, however, that the scope of Dr. Stark's services did not conform to the definition of CPT Code 99213 that was used on the billing form, and that it was inappropriate for him to write a diagnosis of diarrhea, without more, on that form. In short, they claim that Dr. Stark obtained a fee based on false representations.

If there is to be any recovery at all against a physician or a medical practice under the CPPA as applied in 1995, see *supra* note 9, there has to be a way of distinguishing a valid statutory claim from a personal injury action outside the scope of the statute. Accordingly, in *Dorn II*, Judge Urbina articulated a basis for recovery against a medical practice under the CPPA that is distinguishable from a malpractice claim. A patient, he said, may recover damages from a physician under the statute if—but only if—there is "a nexus between the [CPPA claim] and the entrepreneurial aspect of the medical practice." 157 F.Supp.2d at 47. More specifically, Judge Urbina concluded that the CPPA would afford recovery for a physician's (intentional) misrepresentation only if the plaintiff can prove (by clear and convincing evidence) that "the claim at issue" was generated by an entrepreneurial motive.[10] *Dorn II*, 157 F.Supp.2d at 46. A plaintiff, in other words, had to link the misrepresentation to a motive for financial gain—for example, by using a misleading sales pitch to get the medical business. In *Dorn II*, however, Judge Urbina concluded as a matter of law that the record did not establish that the doctor's statement at issue was made for "entrepreneurial motives." Moreover, it fell "well short of what is needed to allow a jury to infer

---

**10.** *See Quimby v. Fine*, 45 Wash.App. 175, 724 P.2d 403, 405 (1986) (defining entrepreneurial activities as "how the price of [profession-al] services is determined, billed, and collected and the way a [professional services] firm obtains, retains and dismisses clients").

intentional misrepresentation by clear and convincing evidence." *Id.* at 49.

The Caulfields are pursuing a negligent misrepresentation claim for which they insist the bar is lower than required for the intentional misrepresentation claim in *Dorn II.* They rely on *Banks* and the plain language of the CPPA to argue that there is no entrepreneurial nexus requirement. We agree with Judge Urbina that there should be a clear basis for distinguishing a misrepresentation claim that falls within the statute from a personal injury claim that falls outside it.[11] For reasons that follow, however, we need not adopt a formulation, such as *Dorn II's* entrepreneurial nexus requirement—or any other—at this time, because there was no material misrepresentation here.

As elaborated earlier in Part II.B.2., Dr. Stark performed services for which he billed Ms. Caulfield. Although the Caulfields maintain that he used an improper billing code, they did not specify in court what the appropriate billing code would have been or contend that the fee would have been less if another, more appropriate code had been used. Furthermore, on this record, we cannot see how a reasonable juror could have found that the doctor's reference to diarrhea in the small space on the billing form—representing one though not all of her symptoms—amounted to a failure to state a material fact that had a tendency to mislead.

The state of Washington's Court of Appeals has stated a distinction under that state's Consumer Protection Act (CPA) that is relevant here:

[T]he mere reporting and treatment of subjective symptoms described by a patient does not constitute fraud or a violation of the CPA. We note a vast difference between fraud and good faith medical response to patients' subjective complaints.

*State Farm Fire & Cas. Co. v. Huynh,* 92 Wash.App. 454, 962 P.2d 854, 858 (1998) (sustaining verdict that chiropractor who submitted false bills and reports to insurance company after treating patients for injuries in staged auto accident was liable under state's CPA). We believe that, after learning all the facts and inspecting Dr. Stark's bill, a reasonable juror could only find a "good faith medical response" to the Caulfields' "subjective complaints," not a misrepresentation or omission having a tendency to mislead. *Id.* Again, in this case, we do not need to consider how to draw a line between misrepresentations cognizable under the CPPA and personal injury actions because there was no misrepresentation here. We conclude as a matter of law that Dr. Stark's notations on his billing form cannot be characterized as misrepresentations or omissions of material facts which had a tendency to mislead (or came within any of the other CPPA formulations on which the Caulfields rely, see *supra* note 7).

D. *Punitive Damages.*

 The Caulfields argue that the trial court erred in not allowing the jury to consider whether they were entitled to punitive damages. "Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud,

---

11. It is not clear to us that the entrepreneurial nexus formulation draws a line between misrepresentation and personal injury. It also could be understood to draw the line between two subsets of misrepresentations: those that are actionable under the CPPA and those that are not. If the latter interpretation is intended—if some misrepresentations are to be read out of the statute while others stay in—that interpretation is not clearly indicated and would raise an issue of statutory interpretation that has not been briefed and argued here.

ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Washington Med. Ctr., Inc. v. Holle,* 573 A.2d 1269, 1284 (D.C.1990) (internal quotations and citations omitted); *accord Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C. 1995). Because the jury found that the Medical Group breached the requisite standard of care, but that this breach of care was not the proximate cause of the Caulfields' injuries, there is no "tortious act" here that could serve as a basis for punitive damages, and thus no reason for us to consider this issue further.

## III.

### EVIDENTIARY RULINGS

*A. Handwriting Sample.*

The Caulfields contend that the trial court abused its discretion by allowing Dr. Stark, after he had completed his testimony, to retake the witness stand for the limited purpose of authenticating some checks that he had written in 1995. Dr. Stark introduced this handwriting evidence to demonstrate how he wrote the numeral 5. This issue arose because the Caulfields contended at trial that the preauthorization form allegedly completed by Dr. Stark during his May 17, 1995 consultation with Ms. Caulfield had been prepared sometime later than that date because it had not been produced with Ms. Caulfield's other medical records during discovery. A juror also questioned whether the "date of procedure" on the form was "5/24/95" or "5/24/98." The Caulfields now contend on

appeal that the admission of these checks to address this issue had been "highly prejudicial" and "an unfair surprise," and that they had not been given an opportunity to determine the authenticity of the checks or to have them analyzed by a handwriting expert.

■ "The determination of what evidence is relevant, and what evidence may tend to confuse the jury, is left to the sound discretion of the trial court." *Turcios v. United States Servs. Indus.,* 680 A.2d 1023, 1030 (D.C.1996). The Caulfields raised the issue of the date on the preauthorization form during trial to support their contention that the form had been prepared after this litigation was initiated. Additional emphasis was directed to the date on the form when a juror questioned whether the last digit in the date was a "5" or an "8." Thus, the Caulfields should not have been surprised that Dr. Stark would attempt to contest this assertion with his own evidence and testimony.[12]

■ Furthermore, the court did not abuse its discretion by refusing to allow the handwriting on the checks to be the subject of analysis by a handwriting expert. "There can be no question that an *express acknowledgment* by the purporting writer affords an adequate ground of belief in the authenticity of the writing received, and this is generally accepted." 3 WIGMORE, EVIDENCE § 700 (Chadbourn rev.1970). Dr. Stark testified that the checks admitted in evidence were written by him in 1995. Accordingly, because

---

12. Dr. Stark's partner and colleague, Dr. McMackin, testified that he was familiar with Dr. Stark's handwriting and that he believed the last digit in the date on the preauthorization form in the line labeled "date of procedure" was the numeral five. Ms. Belle also testified that the date of the procedure on the preauthorization form was written by Dr. Stark. To further demonstrate that the form was not prepared after the litigation commenced, Ms. Belle further testified that she wrote the date "5/24/95" on another line labeled "today's date."

the handwriting was authenticated by the writer the trial court did not abuse its discretion in allowing the admission of the checks written by Dr. Stark.

### B. *Impeachment with a Learned Treatise.*

The Caulfields argue that the trial court abused its discretion by failing to allow the impeachment of Dr. Stark with a learned treatise. The trial judge did not permit this line of questioning because Dr. Stark was testifying as a fact witness, not as an expert witness.

The Caulfields were not prejudiced by their inability to impeach Dr. Stark with a learned medical treatise since both parties engaged independent expert witnesses to testify regarding the appropriate standard of care. The Caulfields' expert witness, Dr. Bernard Heckman, concluded that Dr. Stark had not complied with the applicable standard of care in his treatment of Ms. Caulfield because, among other reasons, he had not performed a digital rectal exam of Ms. Caulfield on May 17, 1995. Dr. Heckman's opinion was contradicted by Dr. Stark's and the Medical Group's expert, Dr. Stuart Danovitch, who stated that the standard of care dictated that Dr. Stark perform the digital rectal exam at the time of the colonoscopy and not during the office visit. The Caulfields did not attempt to impeach Dr. Danovitch with "Harrison's Textbook of Internal Medicine" or any other learned medical treatise.

Based on the record, it would be speculative to conclude what Dr. Stark's testimony would have revealed if he had been impeached with the Caulfields' unspecified reference to "Harrison's Textbook of Internal Medicine." *See District of Columbia v. Kora & Williams Corp.,* 743 A.2d 682, 690 (D.C.1999) (stating that "[t]o properly preserve excluded testimony for review on appeal, trial counsel must nor-mally make an offer of proof") (internal quotations and citations omitted). Consequently, the trial court did not abuse its discretion by disallowing the impeachment of this witness.

*Affirmed.*