*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-628

RACHEL M. FRANKENY, APPELLANT,

v.

DISTRICT HOSPITAL PARTNERS, LP, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-3349-16)

(Hon. Florence Y. Pan, Trial Judge)

(Argued June 19, 2019                    Decided February 27, 2020)

*Jacob M. Lebowitz* for appellant.

*Christopher M. Corchiarino*, for appellees. *Thomas V. Monahan, Jr.* and *Jhanelle A. Graham Caldwell* were on the brief.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and RUIZ, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*:   In this appeal, appellant Rachel

Frankeny claims that appellees District Hospital Partners, LP d/b/a The George

Washington University Hospital and Universal Health Services, Inc. (together

"GWUH")[1] violated the District of Columbia Consumer Protection Procedures Act, *see* D.C. Code §§ 28-3901, to -3913 (2013 Repl.) (the "CPPA" or "Act"), when GWUH failed to inform her that her bilateral tonsillectomy was to be performed in part by a first-year medical resident, rather than the seasoned board-certified surgeon whom she selected. She claims this failure constituted a material misrepresentation of the services provided in violation of the CPPA.[2] The trial court granted summary judgment in favor of GWUH, concluding that Ms. Frankeny was required – but failed – to present evidence of an "entrepreneurial motive," i.e., that the hospital's misrepresentation was intentional and motivated by business interests or financial gain.

We conclude that the trial court erred in requiring Ms. Frankeny to provide evidence of an "entrepreneurial motive" to sustain her CPPA claims against GWUH. Under D.C. Code § 28-3904 (e) and (f), a plaintiff-consumer "need not

---

[1] Appellee District Hospital Partners, LP d/b/a The George Washington University Hospital is a nongovernmental joint partnership between appellee Universal Health Services, Inc. and The George Washington University. Ms. Frankeny also sued Medical Faculty Associates and Thomas Troost, MD, but settled with them during the pendency of this appeal; both were dismissed.

[2] Ms. Frankeny alleges CPPA violations under D.C. Code § 28-3904(a) & (d)-(f). Because these claims are similar and pertain to the same factual allegations, we will refer to all of her CPPA claims together as "misrepresentation," unless stated otherwise.

allege or prove intentional misrepresentation or failure to disclose to prevail on a claimed violation of" the CPPA. *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1073 (D.C. 2008) ("*Fort Lincoln*"). We extend that reasoning and hold that a plaintiff consumer need not allege or prove intentional misrepresentation to claims made under D.C. Code § 28-3904(a) and (d). Moreover, we reject any requirement that a CPPA claim allege an "entrepreneurial nexus." Accordingly, we reverse the grant of summary judgment and remand this case for trial.

## I. Factual Background

The record viewed in the light most favorable to Ms. Frankeny, as the non-moving party, is as follows. In 2013, Ms. Frankeny suffered from sleep apnea and sought the care of Dr. Thomas Troost, a board certified otolaryngologist (ear, nose, and throat surgeon) who practiced at The George Washington University Hospital. At Dr. Troost's recommendation, Ms. Frankeny agreed to a bilateral tonsillectomy to treat her sleep apnea. Ms. Frankeny signed two Patient Authorization Forms, one on May 7, 2013, during a preoperative assessment, and another on May 9, 2013, the day of the surgery. In relevant part, both Patient Authorization Forms stated that Ms. Frankeny understood that, "The George Washington University

Hospital is a teaching hospital," and that her "health care team will be made up of hospital personnel (to include nurses, technicians, and ancillary staff) under the direction of my attending physician and his/her assistants and designees (to include interns, residents, fellows and medical students)." Ms. Frankeny also signed a Patient's Request for Procedure, Operation, and Treatment form on May 9, 2013, which likewise stated that, "Knowing that the George Washington University Hospital is a teaching institution, I understand that along with my doctor and his/her assistants and designees, other Hospital personnel such as residents, trainees, nurses, and technicians will be involved in my procedure/operation/treatment and care." This Form expressly stated, "I understand and agree to the presence of appropriate observers for the advancement of medical education and care." Ms. Frankeny did not understand the forms as requesting her approval for someone other than Dr. Troost to perform the surgery; instead, she understood the forms to mean that other medical staff would be "involved" by, for example, observing the surgery or providing related services. Ms. Frankeny further did not recall GWUH informing her that someone other than Dr. Troost would perform the procedure. Ms. Frankeny claims that, had GWUH told her that a resident could perform part of the procedure, it would have raised "a huge red flag," and she probably would not have agreed to go forward. Ultimately, without Ms. Frankeny's knowledge, a first-year resident, Dr. Johnny Mai,

performed at least part of the surgical procedure under the direction of Dr. Troost.[3]

Ms. Frankeny claims that she suffered a "significant and permanent loss of her

sense of taste" following the surgery.[4]

On May 5, 2016, Ms. Frankeny filed suit against GWUH for not disclosing

Dr. Mai's involvement, which she argues was a material misrepresentation of

services rendered in violation of the CPPA. *See* D.C. Code § 28-3904(a) & (d)-(f).

GWUH subsequently filed a motion for summary judgment, and a hearing on the

motion was held on May 11, 2018. At the hearing, the trial court observed that, in

its view, Ms. Frankeny's CPPA claims turned on one issue: whether there was

evidence of an "entrepreneurial motive," i.e., "an intentional misrepresentation that

is motivated by financial or entrepreneurial considerations" on GWUH's part in

failing to inform Ms. Frankeny of Dr. Mai's role in her surgery. Although

recognizing that intent and scienter are not ordinarily required to prove a CPPA

claim, the court noted a difference between "general" CPPA claims and CPPA

claims brought in the medical services context. The trial court's conclusion was

---

[3] It is unclear from the record whether Dr. Mai removed one or both tonsils.

[4] In connection with Ms. Frankeny's allegations of injury, she filed suit in the D.C. Superior Court for medical malpractice, lack of informed consent, and battery in Case No. 2016-CA-6461-M. The medical malpractice suit was settled against all parties and dismissed.

based on its interpretation of two federal district court decisions: *Dorn v. McTigue*, 121 F. Supp. 2d 17 (D.D.C. 2000) ("*Dorn I*"), and *Dorn v. McTigue*, 157 F. Supp. 2d 37 (D.D.C. 2001) ("*Dorn II*"). Finding no evidence that GWUH intentionally failed to disclose Dr. Mai's involvement to Ms. Frankeny for financial gain or business interests, the trial court granted summary judgment in favor of GWUH. This appeal followed.

## II. Legal Framework

We review de novo the trial court's grant of summary judgment. *Briscoe v. District of Columbia*, 62 A.3d 1275, 1278 (D.C. 2013). Summary judgment is appropriate if there are no disputed issues of material fact and the record conclusively shows that the moving party is entitled to judgment as a matter of law. *Id.* Determining which facts are material depends on the elements of the cause of action, for summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of *an element* essential to that party's case." *Night & Day Mgmt., LLC v. Butler*, 1010 A.3d 1033, 1037 (D.C. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (emphasis added). In this case, that requires interpreting the relevant provisions of the CPPA, a task that we undertake *de novo*. *See District of Columbia v. Cato Inst.*, 829 A.2d

237, 239 (D.C. 2003). The record is viewed in the light most favorable to the non-moving party, who is entitled to "all favorable inferences which may reasonably be drawn from the evidentiary materials." *Tolu v. Ayodeji*, 945 A.2d 598, 601 (D.C. 2008) (citation and internal quotation marks omitted).

### A. *The Consumer Protection Procedures Act*

"The District of Columbia Consumer Protection Procedures Act affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (citation and internal quotation marks omitted). The Act is "construed and applied liberally" and establishes a consumer's "right to truthful information about consumer goods and services" that are purchased or received in the District of Columbia. D.C. Code § 28-3901(c); *see also* D.C. Code § 28-3905(k)(1)(A) (providing private right of action). To this end, the Act overcomes the "pleadings problem associated with common law fraud claims"[5] by abridging the elements needed to prove a CPPA violation. *Fort Lincoln*, 944 A.2d at 1073 n.20.

---

[5] The elements of common law fraud are: (1) a false representation; (2) of a material fact; (3) made with knowledge of its falsity; (4) with an intent to deceive; and (5) detrimental reliance. *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977).

A consumer need not prove that she was "misled, deceived, or damaged" by a merchant's actions. D.C. Code § 28-3904. Further, a consumer need not always prove that the merchant made an intentional misrepresentation under the CPPA. This was not always clear. Prior to our decision in *Fort Lincoln*, it was an unanswered question whether only intentional misrepresentation claims were actionable under the CPPA. *Caulfield v. Stark*, 893 A.2d 970, 976-77 (D.C. 2006). In *Fort Lincoln*, however, we held that, in light of the plain language and the legislative intent of the CPPA, a consumer need not allege intentional misrepresentation of a material fact or an intentional failure to disclose a material fact under D.C. Code § 28-3904(e) and (f). 944 A.2d at 1073; *see also Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013). We examined D.C. Code § 28-3904, which delineates acts that violate the CPPA, and noted that the Council of the District of Columbia (the "D.C. Council") specified that certain acts had an intent requirement, while other acts made no mention of intent. *Fort Lincoln*, 944 A.2d at 1073 (identifying D.C. Code § 28-3904(r)(1)-(5) & (t) as requiring acts "be done with deceit or with knowledge"). [6] For claims of

---

[6] For example, D.C. Code § 28-3904(r)(1) and (5) state that it is a violation of the CPPA if a merchant "make[s] or enforce[s] unconscionable terms or provisions of sales or leases" with "*knowledge* by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer" or if the merchant "has *knowingly* taken advantage of the inability of the consumer reasonably to protect his interests by

(continued . . .)

misrepresentation, the statute merely provides that it is a violation of the CPPA if the merchant "misrepresented" or "failed to state" a material fact. *Id.* Consequently, we held that the fact that the D.C. Council did not expressly state that a merchant must "knowingly" or "intentionally" misrepresent or fail to state a material fact meant that intentionality is not required under D.C. Code § 28-3904(e) and (f). *Id.* Instead, a consumer only needs to establish that the merchant made a material misrepresentation under § 28-3904(e), or failed to make a material disclosure under § 28-3904(f). *Saucier*, 64 A.3d at 442.

To be sure, we have not yet had occasion to decide whether intentionality is required to claim a violation of the CPPA under § 28-3904(a) and (d).[7]  However,

_____

(. . . continued)

reasons" of incompetency. (emphasis added). These provisions of the CPPA, therefore, specifically indicate that a merchant's knowledge of the unfair terms is a required element of the violation.

[7] Specifically, it is a violation of the CPPA "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:"

> (a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
>
> . . .

(continued . . .)

we now hold that intent or knowledge is not required under these provisions, as we did with claims of misrepresentation under § 28-3904(e) and a failure to state a material fact under § 28-3904(f), because the D.C. Council did not explicitly state that intent or knowledge is necessary to sustain a CPPA claim under § 28-3904(a) and (d). Accordingly, a consumer need not prove that a merchant intentionally or knowingly represented that the goods or services have a characteristic or were of a standard or quality that they did not, in fact, have. *See, e.g.*, *Fort Lincoln*, 944 A.2d at 1073.

For purposes of § 28-3904(e) or (f), a misrepresentation or omission is "material" if a reasonable person "would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction" or "the maker of the representation knows or has reason to know" that the recipient likely "regard[s] the matter as important in determining his or her choice of action." *Saucier*, 64 A.3d at 442 (quoting Restatement (Second) Torts § 538(2) (Am. Law

_____

(. . . continued)

> (d) represent that goods or services are of particular
> standard, quality, grade, style, or model, if in fact they
> are of another.

D.C. Code § 28-3904(a) & (d).

Inst. 1977)). Ordinarily materiality is a question for the factfinder. *Id.* The burden of proof for CPPA claims is clear and convincing evidence. *Pearson v. Chung*, 961 A.2d 1067, 1073 (D.C. 2008).

### B. CPPA Claims Against Medical Service Providers

Historically, "learned professions" were not considered a "trade" subject to consumer protection laws. *See Quimby v. Fine*, 724 P.2d 403, 405 (Wash. Ct. App. 1986).[8] When enacted, the CPPA specifically prohibited the District's Department of Consumer and Regulatory Affairs (DCRA) from applying the CPPA to the "professional services of clergymen, lawyers, practitioners of the healing arts and Christian Science practitioners engaging in their respective professional endeavors," D.C. Code § 28-3903(c)(2)(C) (1981), highlighting that "religion, law, and medicine" were exempt under the statute. *See* D.C. Council, Report on Bill 1-253 at 17 (Mar. 24, 1976).

Any limitation of the CPPA with respect to the practice of medicine,

---

[8] In fact, the Maryland Consumer Protection Act expressly exempts professional services, such as services by lawyers or medical or dental practitioners, from suit. *See* Md. Code Ann., Com. Law § 13-104 (2001); *see also Hogan v. Md. State Dental Ass'n*, 843 A.2d 902, 906 (Md. Ct. Spec. App. 2004).

however, ended in 1991 when the D.C. Council amended the statute and deleted "practitioners of the healing arts" from § 28-3903(c)(2)(C), thereby extending the CPPA's protections to the field of medicine. *See* District of Columbia Consumer Protection Procedures Amendment Act of 1989, D.C. Law 8-234, § 2(d), 38 DCR 296 (Mar. 8, 1991). While the legislative history is silent as to the D.C. Council's intent behind this amendment, a statement from the Director of the DCRA highlighted that the agency had received, and been forced to reject, complaints against doctors. Statement of Donald G. Murray, Director, DCRA, on Bill 8-271 and Bill 8-111 Amendments to the Consumer Protection Procedures Act Before the Committee on Consumer and Regulatory Affairs, at pp. 6-7 (May 25, 1990). Although Mr. Murray's statement acknowledged that the lodged complaints "usually involve[d] fees," he stressed that amending the CPPA to include doctors would allow DCRA "to handle fee cases that involve misrepresentations, the practitioner's failure to state a material fact, and other activities described as unlawful trade practices." *Id.* at 6-7. By enacting the statutory amendment and deleting "practitioners of the healing arts," the D.C. Council ended the exclusion of the practice of medicine from the CPPA's coverage. As this court held in *Caulfield*, the practice of medicine is considered a "trade practice" under the CPPA. 893 A.2d at 976.[9]

---

[9] As we have construed the Act in light of subsequent amendments, the

(continued . . .)

We acknowledge that some courts have limited the reach of consumer protection laws to the practice of medicine, expressing concern that lawsuits brought under consumer protection laws may blur the line between consumer protection and medical malpractice claims or render the "well-developed body of law concerning medical malpractice . . . obsolete." *Nelson v. Ho*, 564 N.W.2d 482, 486 (Mich. Ct. App. 1997). Accordingly, some courts have attempted to distinguish between traditional medical malpractice claims, which pertain to the "actual performance of medical services or the actual practice of medicine," from consumer protection claims, which pertain to "allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice." *Id.* Only the latter fall within the definition of "trade or commerce" and are thereby encompassed within consumer protection laws. *Id.* The federal district court in *Dorn I* and *II* sought to adopt this distinction, concluding that a consumer claiming a violation of the CPPA against a medical service provider must present evidence of an "entrepreneurial nexus" between the alleged misrepresentation and the

---

(. . . continued)

CPPA does not extend a private cause of action to the acts of those professionals expressly excluded from the statute. *See Gomez v. Ind. Mgmt. of Del., Inc.*, 967 A.2d 1276, 1288 (D.C. 2009) (observing that the CPPA did not intend to extend a private cause of action to acts of clergymen, lawyers, and Christian Science practitioners, among others).

"economic considerations related to the medical profession," which "does not cover the skill or performance of a medical practitioner." *Dorn I*, 121 F. Supp. 2d at 19-20; *see also Dorn II*, 157 F. Supp. 2d at 48. Contrary to GWUH's assertion, and despite having the opportunity to do so, we have not adopted the holdings in *Dorn I* and *II* and the "entrepreneurial nexus" requirement for CPPA claims related to the practice of medicine. *See, e.g.*, *Caulfield*, 893 A.2d at 979 ("[W]e need not adopt a formulation, such as *Dorn II*'s entrepreneurial nexus requirement – or any other – at this time."). [10] We now take this opportunity to reject such an "entrepreneurial nexus" requirement.

There is no statutory basis for adopting an "entrepreneurial nexus" for CPPA claims related to the practice of medicine, as the statute does not create any limitation in defining medical services as a "trade practice." Rather, the D.C. Council amended the CPPA to fully include medical professionals within the statute's coverage. Appellees claim that CPPA claims should be applied "more restrictively" in the context of medical services to "ensure that medical malpractice claims are not improperly brought . . . as consumer protection claims." However,

---

[10] Moreover, *Dorn I* and *II*, which the trial court here read as calling for an "entrepreneurial motive" test, are federal decisions that are not binding on this court. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). Although we have considered these cases, we do not find them persuasive in light of the statute's text and legislative history.

any concern that the line between CPPA claims and traditional medical malpractice claims will be blurred appears to be overstated. While a rare medical malpractice case may also meet the elements of a CPPA claim, the two have different elements, require different types of evidence, and permit different types of damages.[11] The elements of a CPPA claim and medical malpractice claim are very different: unlike those pursuing a medical malpractice claim, claimants under the CPPA need not prove a doctor/hospital-patient relationship giving rise to a duty of care, the strictures of an applicable standard of care, violation of that standard of care, causation, or injury. *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979). Moreover, the type of evidence that must be presented is also different, as a medical malpractice claim will usually require expert evidence to establish the standard of care, *see Snyder v. George Washington Univ.*, 890 A.2d 237, 244 (D.C. 2006) ("Expert testimony is typically required to establish each of the three elements [in a medical malpractice case] except where proof is so obvious as to lie within the ken of the average lay juror." (internal citations and quotations omitted)), which is not required (though may be relevant) to a CPPA claim.

We expressly hold that there is not a different burden of proof for "general"

---

[11] It remains unclear whether the CPPA allows for damages for "personal injury of a tortious nature," *Gomez*, 967 A.2d at 977 n.9, and we decline to clarify that issue here.

CPPA claims and those against medical service providers, and a consumer is not required to proffer evidence of an "entrepreneurial motive" or an "entrepreneurial nexus" for the latter. Moreover, our cases have rejected the need for a consumer to prove a showing of "motive" or intent in connection with CPPA misrepresentation claims under D.C. Code § 28-3904(a) & (d)-(f), and we now reach the same conclusion as to CPPA claims against medical service providers. At no point in *Fort Lincoln* or in subsequent cases did we distinguish between different types of CPPA claims, and nothing in the plain language of the statute makes such a distinction.

By rejecting the entrepreneurial nexus, we do not eliminate all restraints on the CPPA's reach to the medical profession. The Supreme Court, in recognizing that the anticompetitive conduct of lawyers falls within the reach of federal antitrust laws, acknowledged that it is "unrealistic to view the practice of [learned] professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 788-89 n.17 (1975). The Court acknowledged that the "public service aspect, and other features of the profession, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." *Id.*

Similarly here, we acknowledge that certain aspects of the practice of medicine, such as those premised on public service or ethical norms, may lend necessary context to evaluate a medical professional's conduct and determine whether it can support a CPPA claim. *See, e.g.*, *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 348-49 (1982) (holding that doctors' price-fixing agreements were "not premised on public service or ethical norms" and therefore fell within the scope of federal antitrust laws). Because we find any such limitation to be inapplicable here, however, we decline to address the contours of such an exclusion.

## III. Summary Judgment

With this legal framework in mind, we turn to the question of whether the trial court erred in granting GWUH's motion for summary judgment. Ms. Frankeny claims that GWUH's failure to inform her of Dr. Mai's role in her surgery constituted misrepresentation or a failure to state a material fact under the CPPA, in violation of D.C. Code § 28-3904(e) and (f). She also claims that GWUH violated the CPPA when it represented to her that the services were of a particular characteristic or quality that they did not have, in violation of D.C. Code § 28-3904(a) and (d). Consistent with the plain language of the CPPA and our decision in *Fort Lincoln*, we look to see if the evidence, in the light most favorable

to Ms. Frankeny, would permit a jury to find that there was a misrepresentation or omission, and that the misrepresentation or omission was material. *Saucier*, 64 A.3d at 442.[12] Ms. Frankeny does not need to prove that she was damaged by the misrepresentation or omission. Critically, she also does not need to prove that the misrepresentation or omission was intentional under § 28-3904(a) & (d)-(f).

Consequently, on this record, we conclude that Ms. Frankeny presented sufficient evidence to survive summary judgment on her CPPA misrepresentation claims, and to proceed to trial. The evidence viewed in the light most favorable to Ms. Frankeny demonstrates a material factual dispute as to whether GWUH made a misrepresentation or failed to disclose material information. Ms. Frankeny believed that the surgery would be performed by her surgeon of choice, Dr. Troost, and the Patient Authorization Forms did not state that a resident, such as Dr. Mai, could perform the surgery. The language used in the forms, namely, that residents or medical students would be "involved" in her care, is at best ambiguous as to

---

[12] GWUH states that Ms. Frankeny originally pleaded in her complaint that GWUH "recklessly and intentionally" misrepresented Dr. Mai's role, but later changed her argument, indicating that she did not need to show intentional misrepresentation under the CPPA. To the extent that GWUH is claiming that Ms. Frankeny is precluded from arguing unintentional misrepresentation, we disagree. It is evident that the focus of the summary judgment hearing, and the arguments on appeal, pertain to the viability of Ms. Frankeny's CPPA claim under a theory of unintentional misrepresentation. *See, e.g.*, *Norried v. Caribbean Contractors, Inc.*, 899 A.2d 129, 134 (D.C. 2006).

whether she was informed that a resident might perform the surgery. The forms do not disclose that someone other than Dr. Troost could perform the surgical procedure, only that others may serve as part of her "health care team" (which included all manner of medical and hospital personnel) and that some "appropriate observers" could be "presen[t] . . . for advancement of medical education and care." A jury could find that the evidence, viewed in the light most favorable to Ms. Frankeny, made it reasonable for Ms. Frankeny to understand the forms as authorizing residents to observe Ms. Frankeny's procedure for the advancement of their medical education and care or to perform related services, not to perform the surgery itself. And GWUH did not expressly inform Ms. Frankeny that Dr. Mai would perform the surgery.

Further, the evidence viewed in the light most favorable to Ms. Frankeny supports and would permit a jury to find that the misrepresentation or failure to disclose information was material. *Saucier*, 64 A.3d at 442. A reasonable person could attach importance to the difference in experience between a first-year medical resident such as Dr. Mai and a seasoned board-certified surgeon such as Dr. Troost. Ms. Frankeny testified that GWUH's failure to inform her of Dr. Mai's role would have affected her decision to undergo the surgery. Further, Ms. Frankeny presented an expert witness who testified that a hospital should disclose

a resident's role in the patient's surgery, further supporting her assertion that GWUH's omission of that information was material. Ms. Frankeny also referenced a 2012 Journal of the American Medical Association article which indicated that a hospital such as GWUH should have reasonably known that a resident's involvement in a medical procedure could potentially affect the patient's decision.

Taken together, the evidence was sufficient to place into dispute whether GWUH misrepresented a material fact that a reasonable person would consider in making decisions regarding medical treatment, and the case therefore should have proceeded to trial to resolve these factual questions. Consequently, we reverse the grant of summary judgment.

At present, there is no concern that Ms. Frankeny is blurring the line between CPPA claims and traditional medical malpractice claims, or raising public service or ethical considerations, that would require us to recognize any limitation on the CPPA's reach to the practice of medicine. Appellant's CPPA claims are based solely on GWUH's alleged misrepresentation in failing to adequately inform her of who would be performing the surgery. The crux of Ms. Frankeny's claims is that GWUH misrepresented, intentionally or unintentionally, who would be

performing her surgical procedure, without regard to whether she was actually misled, injured, or suffered damages;[13] these CPPA claims do not, in and of themselves, pertain to the quality of the medical service provided. Rather, our conclusion is bolstered by the fact that Ms. Frankeny filed a separate medical malpractice suit against GWUH, based on the alleged deficiencies in the performance of the surgery and the alleged injuries resulting therefrom. See *supra* note 4. That suit required proof that the manner in which the medical providers performed their medical functions failed to comport with the standard of care, that the providers' breach of the standard of care was the proximate cause of her injuries, and that she suffered damages resulting therefrom. *See Morrison*, 407 A.2d at 560. The existing framework allows litigants and courts to distinguish, as necessary, between CPPA and medical malpractice causes of action.

## IV. Conclusion

For the abovementioned reasons, we vacate the grant of summary judgment in GWUH's favor, and remand for this case to proceed to trial.

---

[13] The CPPA authorizes treble damages or $1,500 per violation. *See* D.C. Code § 28-3905(k)(2).

*So ordered.*